## The DISTRICT OF COLUMBIA PODIATRY SOCIETY et al., Plaintiffs,

v.

## The DISTRICT OF COLUMBIA et al., Defendants.

### Civ. A. No. 74–772.

United States District Court, District of Columbia.

Nov. 26, 1975.

Richard Medalie, Washington, D. C., for plaintiffs.

Martin Grossman, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

Plaintiffs in this action challenge various aspects of the District of Columbia Medicaid Plan relating to podiatric services. The matter is before the Court at this juncture on the litigants' cross-motions for summary judgment.

The plaintiffs include the District of Columbia Podiatry Society, a professional association of Doctors of Podiatric Medicine (hereinafter, podiatrists), all licensed to practice podiatric medicine in the District of Columbia, and eleven individual podiatrists. Defendants include the District of Columbia, Walter E. Washington, the Mayor-Commissioner of the District of Columbia, and Joseph P. Yeldell, the Director of the Department

of Human Resources of the District of Columbia, and the administrator of the District of Columbia Medicaid Program.

Title XIX of the Social Security Act (Medicaid)[1] provides for a federal program of medical assistance to individuals whose economic resources are insufficient to meet the cost of necessary medical services. It is a grant-in-aid project providing matching federal monies to participating states. The funds are channeled through an appropriate state agency to providers of medical services. Participation by a state is voluntary, but in order to receive federal funds, the state's program must meet certain federal requirements.

The District of Columbia elected to participate and commenced its Medicaid Program as of July 1, 1968. From time to time the District of Columbia Medicaid Plan (D.C. Plan) was amended. All D.C. Plans have been approved by the Secretary of Health, Education, and Welfare (HEW) pursuant to the requirements of Title XIX.[2] In relevant part, the most recent D.C. Plan (effective January 1, 1974) contains a "Schedule of Authorized Procedures and Relative Value Scale for Participating Podiatrists." This schedule specifies the podiatric services which are compensable under the D.C. Plan and the amount of such compensation.

The plaintiffs present three challenges to these provisions of the D.C. Plan.[3]

First, they allege that the podiatrists participating in the District of Columbia Medicaid Program are entitled by federal statute and regulations to be compensated under Medicaid for *all* services they may legally perform as licensed podiatrists, rather than just those services specified in the D.C. Plan. Second, they argue that the defendants in setting fees for podiatrists under the D.C. Plan have failed to comply with the requirements of the Medicaid statute and regulations.[4] Third, plaintiffs in their motion for summary judgment have challenged the constitutionality of the Medicaid statute and have requested the Court to convene a three-judge court pursuant to 28 U.S.C. §§ 2282 and 2284.[5]

Plaintiffs have sought declaratory and injunctive relief against the defendants' enforcement of the complained of provisions of the D.C. Plan.[6] Having considered the pleadings and oral argument of the parties, the Court has determined that the actions of the defendants do not violate the provisions of the Medicaid statute or regulations. Furthermore, the Court has determined that plaintiffs' constitutional challenge is inappropriate and without merit.

THE "SCOPE OF SERVICES" ISSUE

Plaintiffs contend that, by limiting the podiatric services that podiatrists may provide under the D.C. Medicaid Plan while permitting physicians to

---

1. 42 U.S.C.A. § 1396, *et seq.* (1974). Where code sections are referred to in this opinion without accompanying title references, "42 U.S.C.A. § __ (1974)" will be implicit.

2. Section 1396.

3. A fourth claim for relief alleging that podiatrists were being unfairly denied payments for coinsurance and deductibles under the D.C. Medicaid Program was voluntarily dismissed by plaintiffs.

4. This second challenge has changed somewhat from that asserted in plaintiffs' amended complaint. There they had asserted that the governing Medicaid statutes and regulations entitled podiatrists to the *same* compensation as physicians for similar services performed.

5. Plaintiffs press this challenge only if the

Court determines that the actions of defendants challenged in the other two claims for relief do not violate the Medicaid statute or regulations. Plaintiffs in their amended complaint had presented a different constitutional claim. There they had asserted that the practices of the District of Columbia outlined in the other claims for relief (not the Medicaid statute itself) violated the due process clause of the Fifth Amendment.

6. Plaintiffs have also sought monetary damages but that aspect of the case has been postponed pending resolution of the issues of declaratory and injunctive relief. Plaintiffs also sought certification of their suit as a class action. This was denied by the Court on November 12, 1974. *See* 65 F.R.D. 113 (D.D.C. 1974).

furnish a full range of podiatric care, the defendants have violated the Medicaid provisions of the Social Security Act and its regulations. The statute and regulations require that any State Plan must include, at the least, the following five health services listed in the statute (the mandatory services):[7] (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and X-ray services; (4) skilled nursing facility services, screening and diagnostic services, and family planning services; and (5) physicians' services.[8] The statute also includes optional health services which may be included in a State Plan if the state so elects.[9] One of these optional health services is:

> 6) medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners *within the scope of their practice as defined by State law.*[10]

The D.C. Plan includes this class of health services; it is undisputed that podiatric care falls within this classification. Podiatric care as defined by District of Columbia law is:

> the surgical, medical, or mechanical treatment of any ailment of the human foot, except the amputation of the foot or any of the toes; and, also, except the use of an anesthetic other than a local one.[11]

Plaintiffs contend that once defendants elected to include the optional services in the D.C. Plan, they were required to do so to the full extent that such services are defined by District of Columbia law. This, it is conceded by defendants, has not been done. Plaintiffs' position is that any valid limitation on the broad language of the statute must be express. They point to the provision of § 1396d(g)(2) which restricts the scope of chiropractic services compensable under Medicaid. They contend that since there is no comparable provision in the statute or regulations permitting or requiring a limitation on podiatric services, defendants' actions are unlawful.

Plaintiffs' argument fails because of the invalidity of its basic premise that the broad language of the statute was meant to curtail the discretion of the states in devising their Medicaid Plans. Rather, the provisions of Title XIX provide for a "scheme of cooperative federalism."[12] A reading of Title XIX clearly indicates the intent of Congress to give the states considerable discretion and latitude in devising their Medicaid Plans. Thus, federal funds are appropriated under Title XIX "[f]or the purpose of enabling each State, *as far as practicable under the conditions in such State,*" to furnish medical assistance and services.[13] States can choose whether to participate at all; a participating state can choose to include in its plan only the "categorically needy,"[14] or it can also include the "medically needy";[15] a participating state is free to choose which, if any, of the optional services it will include in its Plan.[16] Such options, amongst others in the statute, are designed to afford each state the opportunity to design a Medic-

---

7. Section 1396a(a)(13)(B); 45 C.F.R. § 249.-10(a)(1) (1974).

8. Sections 1396d(a)(1)–(5).

9. *See* § 1396d(a)(6)–(17).

10. Section 1396d(a)(6) (emphasis added).

11. District of Columbia Code § 2–711.

12. *Doe v. Beal,* 523 F.2d 611, 616 (3d Cir. 1975) (en banc). This phrase was first used in a Social Security Act case dealing with the Aid to Families with Dependent Children (AFDC) provisions of the Act, 42 U.S.C.A. § 601 *et seq.* (1974). *King v. Smith,* 392 U.S. 309, 316, 88

S.Ct. 2128, 20 L.Ed.2d 1118 (1968). *See also New York State Dept. of Social Services v. Dublino,* 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Jefferson v. Hackney,* 406 U.S. 535, 542, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

13. Section 1396 (emphasis added).

14. Section 1396a(a)(10); 45 C.F.R. § 249.-10(a)(1) (1974).

15. Section 1396a(a)(10)(C); 45 C.F.R. § 249.-10(a)(2) (1974).

16. Section 1396a(a)(13); 45 C.F.R. § 249.10(a) (1974).

aid Plan tailored to the needs and conditions in that state.

Moreover, this need for flexibility is mandated by financial considerations. Title XIX is a welfare assistance program with limited funding. It is not an insurance program such as Medicare. Even an insurance program (let alone an assistance program) cannot provide coverage for all possible health services. Therefore, it is necessary for Medicaid funds to be used in the most economical manner possible,[17] and it has been left to the States, operating within the Federal guidelines, to make such economic determinations.

The defendants, in exercising this discretion, have determined which services performed by podiatrists are sufficiently essential to maintaining the general health of Medicaid recipients so as to warrant coverage under Medicaid. It is clear that podiatrists are not compensated under the D.C. Plan for all services they may legally perform. But for that matter, neither is any other provider of medical services compensated for all such services.[18] A similar argument was recently raised in the Third Circuit case of *Doe v. Beal.*[19] Plaintiffs there at-

tacked the Pennsylvania Medicaid Plan for failing to compensate Medicaid recipients for the costs of elective abortions. The challengers argued that since *Roe v. Wade*[20] and *Doe v. Bolton*[21] required the states to legalize the practice of elective abortion during the first two trimesters of pregnancy, elective abortion was included in the statutory definition of "physicians services,"[22] and was therefore required to be furnished to Medicaid recipients by § 1396a(a)(13)(B) and (C). The Third Circuit, sitting *en banc,* rejected this argument, pointing out, for example, that since elective cosmetic surgery is within the licensed practice of medicine, the state, under plaintiffs' argument, would be required to pay for such medical services at the expense, perhaps, of the more urgent medical needs of the poor. As the Court indicated:

> The states are given broad discretion to tailor their programs to their particular needs, and are required to economize and to fund only necessary medical expenses.[23]

In addition, the Medicaid regulations promulgated by the Department of Health, Education, and Welfare indicate

---

**17.** Section 1903(e) of the original Title XIX provisions required the participating states to make efforts to broaden "the scope of the care and services made available under the plan" and to liberalize "the eligibility requirements for medical assistance" with a view towards eventually furnishing "comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources . . .." Social Security Amendments of 1965, Pub.L. No. 89–97, § 121, 79 Stat. 350. Faced with the rapidly inflating costs of medical care and services, Congress repealed this section in 1972. Social Security Amendments of 1972, Pub.L. No. 92–603, § 230, 86 Stat. 1410. *See Doe v. Beal, supra* note 12, at 618 n. 14.

**18.** For example, physicians are compensated for cosmetic surgery only when prior authorization is issued by the State agency. D.C. Plan (1974), Supplement to Attachment 3.1–A (Plaintiffs' Exhibit A), p. 2.

**19.** 523 F.2d 611 (3d Cir. 1975) (en banc).

**20.** 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**21.** 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

**22.** Physicians services are defined by reference to the legal practice of medicine under State law. *See* § 1396d(a)(5) referring to § 1395x (r)(1); 45 C.F.R. § 249.10(b)(5).

**23.** 523 F.2d at 620. The court went on to hold, however, that the Pennsylvania Plan violated Title XIX by not covering elective abortions. The basis of the court's holding was that "once the state has decided to finance full-term delivery and therapeutic abortion as methods for the treatment of pregnancy, it cannot decline to finance non-therapeutic abortions without violating the requirements of Title XIX." 523 F.2d at 622. These considerations as to *methods* of treatment, rather than *scope* of treatment, are not applicable in this case.

that the language "within the scope of their practice as defined by State law" [24] does not require that podiatrists or any other medical care provider be compensated for every procedure or service they may legally perform. In relevant part these regulations provide that a State Medicaid Plan must:

> Specify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needy, if the plan includes this latter group. Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose. . . . Appropriate limits may be placed on services based on such criteria as medical necessity or those contained in utilization or medical review procedures.[25]

Although this passage, as plaintiffs contend, is intended to broaden the scope of medical care and services to insure that the recipients receive comprehensive medical care, it is also intended to give the states the discretion to "specify the amount and duration of each item of medical care and services that will be provided." This position is supported by the response of the HEW regional attorney to the inquiry of plaintiffs' counsel regarding limitations on scope of service: [26]

> 2. *Podiatrist's services are an optional item of service under a State's Medicaid program. As such, a State may impose limitations on the scope of this service.* 45 CFR 249.10(b)(6).

\* \* \* \* \* \*

4. The legal basis for a State's authority to place administrative controls upon the services it provides can be found in 45 CFR 240.10(a)(5) . . ..
This limitation-setting provision enables the States to have some degree of control over not only the amount, duration, and scope of services, but the cost of the Medicaid program to the State. As for the items being sufficient to achieve their purpose this provision has been placed in the regulations to assure that [if] a service is covered in the State Plan no unreasonable limitations are placed upon the covered service which would prevent it from achieving its purpose. For example, it would be unreasonable for a State to cover immunization against polio but limit the dosage of vaccine to one. (Emphasis added).

It appears then that it is the position of HEW, the agency which issued the Medicaid regulations, that the "amount, duration, and scope" provision permits the District to limit the scope of podiatric (or other optional) services compensable under Medicaid.[27]

Nor does the fact that Congress has chosen to limit the chiropractors' services compensable under Medicaid [28] indicate that Congress intended to prohibit the states from limiting the scope of other services. The chiropractic services provision is merely another indication of the congressional recognition that in any medical assistance program there must be some limitations. The Medicaid regulations, as discussed above,[29] indicate that the decisions on other limitations

---

24. Section 1396d(a)(6). *See* text accompanying note 10 *supra.*

25. 45 C.F.R. § 249.10(a)(5)(i) (1974).

26. This letter, although not filed as an exhibit, was quoted in part in defendants' memorandum of points and authorities in support of their summary judgment motion, and was referred to by plaintiffs without objection as to its authenticity in their response thereto.

27. Of course, the scope of services provided should be sufficient to reasonably achieve their purpose. Defendants have presented an

affidavit in which Dr. Ozella Webb, Chief of the Medical Assistant Unit of the D.C. Medicaid Program, indicated that the Medicaid unit has received no complaints from eligible recipients that they are unable to obtain needed podiatric care. Although this statement in an affidavit is not conclusive, plaintiffs have presented no evidence to the contrary or to the effect that the podiatrists' services provided are not achieving their purposes.

28. Section 1396d(g)(2).

29. 45 C.F.R. § 249.10(a)(5)(i) (1974).

are to be made by the appropriate state agency. Where Congress has wanted to limit the power of the state agencies to restrict practitioners' services, it has explicitly done so. Thus, Congress has legislated a special provision defining optometrists as physicians (under appropriate circumstances) so that their services are now mandatory.[30] Furthermore, under Medicare, Congress has explicitly included podiatrists within the definition of physician.[31] Under Medicaid, Congress took a different position excluding podiatrists. The plaintiffs, then, cannot object to the D.C. Plan distinguishing between physicians and podiatrists when this distinction is built right into the statute.[32]

## THE "FEE SCHEDULE" ISSUE

■■■■■ The D.C. Medicaid Plan specifies the fees to be paid to participating podiatrists for those services compensable under the Plan. The plaintiffs allege that in establishing this fee schedule the defendants failed to comply with the requirements of the Medicaid statute and regulations. The thrust of this allegation is that if defendants are required to comply with the federal provisions, podiatrists will receive greater compensation on an overall basis for compensable Medicaid services, comparable to that received by physicians for the same services.

The fee schedule for podiatrists is based on a relative value scale (RVS). The podiatrists' RVS was developed as part of the first D.C. Medicaid Plan. Likewise, a physicians' RVS was developed. Each service that a practitioner is compensated for is weighted on the RVS for his specialty. To compute the amount payable for a compensable service, the RVS factor for that service is multiplied by a conversion factor. The conversion factor for podiatrists is $0.80. For physicians the conversion factor is $1.65 for special diagnostic services, $1.92 for medical and special therapeutic services, $3.40 for surgical services, $4.00 for laboratory services, and $4.50 for radiological services. Since both the RVS and the conversion factor are different for physicians and podiatrists, the amounts paid to each group for performing identical procedures are often different. In some instances, the amounts paid to podiatrists are greater than those paid to physicians. For other procedures physicians are paid more than podiatrists.[33]

Plaintiffs contend that the continued use of RVS fee schedules violates the Medicaid regulations. The regulations provide that a State plan must "[p]rovide that payments for care or service

---

**30.** Section 1396d(e).

**31.** Section 1395x(r)(3).

**32.** Plaintiffs also place much reliance upon the "free choice" provision added to the Medicaid statute in 1967. Section 1396a(a)(23) requires that any State plan must:

provide that any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services . . . .

The purpose of this amendment, plaintiffs contend, is to give the individual recipient a choice from among all qualified providers of service. The D.C. Plan, they argue, has limited this free choice by imposing restrictions on the services that podiatrists may provide.

The key phrase in this provision is "qualified to perform the service." Considering the wide latitude given the states in devising their own Medicaid plans, this phrase can only mean

that a provider is "qualified" if the service is one compensable under the State Plan. Thus a recipient may seek the services of any participating physician for services that a physician may perform under the State Plan. Likewise he may seek assistance from any participating podiatrist for services that a podiatrist may perform under the State Plan. The "free choice" provision, however, does not entitle the recipient to obtain assistance from a podiatrist for those services that may be performed only by a physician under the State Plan.

**33.** Plaintiffs' Exhibit L contains Defendants' Comparison of Physicians' and Podiatrists' Services and Fees. For example, for a suture over one inch to and including two inches, the D.C. Plan will pay a podiatrist $48.00 and a physician $13.60. For the treatment of a simple or compound, open reduction fracture, a podiatrist will receive $80.00 and a physician $170.00.

are not in excess of the upper limits described in paragraph (b) of this section." [34] Paragraph (b) provides, as to physicians and podiatrists, that:

. . . A payment structure will meet Federal requirements if . . . : (1) Payment to the individual practitioner is limited to the lowest of

(i) His actual charge for service;

(ii) The median of his charge for a given service . . . ; or

(iii) His reasonable charge recognized under part B title XVIII [Medi*care*]

(2) In no case may payment exceed the highest of

(i) . . . the 75th percentile of the range of weighted customary charges . . . ;

(ii) The prevailing charge recognized under part B, title XVIII [Medi*care*] . . . ; or

(iii) The prevailing reasonable charge recognized under part B, title XVIII [Medi*care*].

45 C.F.R. § 250.30(b)(3)(i)(A) (1974). Defendants concede that none of the standards listed above has ever been determined for podiatrists or for any other practitioner. Therefore, plaintiffs contend the payment structures do not meet Federal requirements and are invalid.

Again plaintiffs have misconstrued the regulations and the congressional intent in establishing the Medicaid program. Each state has been given the discretion to set fees for medical service providers at the level which will best meet the needs and resources of that state. The provisions of Section 250.30(b)(3)(i)(A) do not prescribe any particular methods for setting fees. Rather they specify the

means for determining only the *upper* limit on Medicaid payments. Indeed, it is expressly stated in section 250.30(b):

The upper limits for payments for care and services under a medical assistance plan are as follows: The State agency *may pay less than the upper limits.* . . . (Emphasis added).

The fact that defendants have failed to make the findings required by section 250.30(b)(3)(i)(A) is of no consequence to plaintiffs' claim. Such matters are of concern only between the state agency and the federal government. Since the state can pay less than the upper limits the only effect that the section 250.-30(b)(3)(i)(A) determinations can have on the podiatrists' fee schedule would be to lower it, if it were found to be above the "upper limit." [35]

In a recent case a similar challenge was advanced against the Pennsylvania Medicaid Plan's provision for payments to pharmacies for filling Medicaid prescriptions. In *Ostrow Pharmacies, Inc. v. Beal,*[36] the state agency had not made the requisite cost analysis as required by the regulations.[37] Plaintiffs argued, therefore, that the state plan for drug payments was invalid. In rejecting plaintiffs' challenge, the court in *Ostrow* stated:

The defendants contend that the thrust of the Act and the federal regulations requires a state to make payments "that are not in excess of reasonable charges". The defendants also contend that the state is not bound by any particular formula in determining the amount it pays to providers under the Medicaid program, provided the state pays less than the upper limits. The defendants contend that § 250.30 provides various methods for establish-

---

**34.** 45 C.F.R. § 250.30(a)(3) (1974).

**35.** On this point is the letter from the HEW regional attorney to plaintiffs' attorney (*see* note 26 *supra*) wherein it is stated:
1. There is nothing in the Title XIX Act or regulations which mandates that a State make equal payments for similar type services provided by different groups of provid-

ers. The payment structure for each group of providers is separate and is set by the individual States. The only Federal requirement is that the pay structure must meet the upper limit requirements as specified in 45 C.F.R. 240.30(b)(3).

**36.** 394 F.Supp. 22 (E.D.Pa.1975).

**37.** *See* 45 C.F.R. § 250.30(b)(2)(i)(A) (1974).

ing upper limits, but the regulation does not require the state to pay the upper limit. *The Court agrees.* Regulation 250.30 clearly states in subsection (b) that "The State agency may pay less than the upper limits." Regulation 250.30 does not establish a minimum fee for pharmaceutical services; it sets forth the upper limit or maximum fee to be paid pharmacists. The purpose of this regulation is to achieve the lowest cost for medical services consistent with efficiency, economy and quality of care.[38]

This Court agrees.

Of course, the fact that there is no prescribed lower limitation on the fee schedule does not mean that a fee schedule may be established which is so unreasonably low that no practitioners will agree to provide services. The regulations require that a State plan must:

> Provide that fee structures will be established which are designed to enlist participation of a sufficient number of providers of services in the program so that eligible persons can receive the medical care and services included in the plan at least to the extent these are available to the general population.[39]

Plaintiffs contend that the podiatrists' fee structure has *not* enlisted "participation of a sufficient number of providers of services." They look for a definition of this phrase to a publication of HEW, *Handbook of Public Assistance Administration, Supplement D: Medical Assistance Programs* (1966–67), which provides in ¶ D–5330.2: [40]

As a minimum, the participation ratio determined separately for each profession, and for specialties within a profession, should be approximately two-thirds of such practitioners in the State.

Of the 120 podiatrists in the Washington Metropolitan area licensed to practice podiatry in the District of Columbia, only 57 (or about half) presently participate in the D.C. Medicaid Program.[41] The chart set out in the margin indicates that the number of participating podiatrists has steadily increased from 30 in 1968 to 57 in 1974.[42] Moreover, of the 120 podiatrists in the Washington Metropolitan area, only 40 are listed in the 1975 Yellow Page telephone directory as having District of Columbia office addresses. In each of the years 1968–1974, at least 24 of the participating podiatrists had D.C. office addresses. Therefore, the percentage of participation of podiatrists with D.C. office addresses (those podiatrists whom D.C. Medicaid recipients would most likely consult) was at the least 60 percent. It must also be remembered that the HEW *Handbook* provision was directed at the states in general, and does not address itself to the situation of an interstate metropolitan area such as Washington, D. C. The Court, therefore, cannot conclude from the data presented by the parties that the podiatrists' fee structure has not enlisted sufficient participation.[43]

## THE CONSTITUTIONAL ISSUE

 The plaintiffs in their amended complaint alleged that the aspects of the D.C. Medicaid Plan objected to in

---

**38.** 394 F.Supp. at 27 (emphasis added).

**39.** 45 C.F.R. § 250.30(a)(6) (1974).

**40.** This *Handbook* has been superseded by the codified regulations in Title 45 of C.F.R. and is looked to here only for persuasive and not conclusive determination of the meaning of "sufficient participation."

**41.** All of the statistics in this section are drawn from the Stipulation of Facts submitted by the parties.

**42.** Number of podiatrists participating in the D.C. Program:

| Year | Number |
|------|--------|
| 1968 | 30 |
| 1969 | 34 |
| 1970 | 38 |
| 1971 | 43 |
| 1972 | 49 |
| 1973 | 56 |
| 1974 | 57 |

**43.** The statement contained in the Webb affidavit (note 27 *supra*) indicates that the D.C.

their other claims, violated the due process clause of the Fifth Amendment. In their motion for summary judgment, however, they appear to have abandoned this contention. They assert, instead, that if the Court rules the D.C. Plan to be in compliance with Title XIX, then the statute itself is unconstitutional. The contention is that since physicians are compensated under Medicaid for the full range of podiatric services and are often compensated at a higher rate, the statute creates a classification which discriminates against podiatrists in violation of the equal protection component of the due process clause of the Fifth Amendment.

Plaintiffs have not sought the permission of the Court to amend their complaint to present this new constitutional attack. Defendants, therefore, have not responded to this issue. Although leave of court to amend "shall be freely given when justice so requires," Fed.Rules Civ. Proc., Rule 15(a), the Court does not deem this to be such a situation.

Even were the Court to allow plaintiffs to amend and present this new constitutional issue, the Court would be compelled to dismiss it as frivolous without convening a three-judge court. A three-judge court need not be convened if the constitutional claims are "obviously without merit" or if their "unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." [44]

The Supreme Court has clearly indicated that Congress has broad discretion in legislating social welfare programs. In upholding the old age benefits provisions in Titles VIII and II of the Social Security Act, the Court in *Helvering v. Davis* [45] stated:

> The line must still be drawn between one welfare and another, between particular and general. Where this shall be placed cannot be known through a formula in advance of the event. There is a middle ground or certainly a penumbra in which discretion is at large. The discretion, however, is not confided to the courts. The discretion belongs to Congress, unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment. [46]

Thus, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [47] From the discussion of the "Scope of Services" and "Fee Schedule" issues, it is clear that there is an obvious congressional desire to limit Medicaid expenditures. In order to do so, Congress may have determined that distinctions between podiatrists and physicians as to the scope of compensable services and amount of compensation were appropriate. It is not for the courts to question the wisdom of such a determination which may favor physicians at the expense of podiatrists. A classification does not offend the Constitution merely "because in practice it results in some inequality." [48]

Medicaid Unit has received no complaints from eligible recipients that they have been unable to obtain podiatric care.

44. *Ex parte Poresky*, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 78 L.Ed. 152 (1933). *See also Bulluck v. Washington*, 152 U.S.App.D.C. 39, 44, 468 F.2d 1096, 1101 (1972).

45. 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937).

46. *Id.* at 640, 57 S.Ct. at 908. Further at 301 U.S. at 644, 57 S.Ct. at 910, the Court stated:
 Whether wisdom or unwisdom resides in the

scheme of benefits set forth in Title II, it is not for us to say. The answer to such inquiries must come from Congress, not the courts. Our concern here, as often, is with power, not with wisdom.
*See also Fleming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

47. *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

48. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911), cited in *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

This constitutional challenge, thus, is so obviously without merit that it can be dismissed as insubstantial without resorting to the requirements of 28 U.S.C. § 2284.