NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

―――――――――――――――――

Merrimack
No. 2012-724


GARY DUBE & a.

v.

NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES & a.

Argued:  November 13, 2013
Opinion Issued:  June 18, 2014

Disabilities Rights Center, Inc., of Concord (C. Adrienne Mallinson, Rebecca G. Whitley, and Amy B. Messer on the brief, and Ms. Mallinson orally), for plaintiffs Gary Dube, Thomas Taylor, Cynthia Washington, and Arthur Furber.

Devine, Millimet & Branch, PA, of Manchester (Thomas Quarles, Jr. and Donald L. Smith on the brief, and Mr. Quarles orally), for plaintiff Harbor Homes, Inc.

Joseph A. Foster, attorney general (Jeanne P. Herrick, attorney, on the brief and orally), for the defendants.

CONBOY, J.  This case involves a petition for injunctive and declaratory relief brought by Harbor Homes, Inc. (Harbor Homes) and Gary Dube, Thomas Taylor, Cynthia Washington, and Arthur Furber (the individual plaintiffs) (collectively, the plaintiffs) against New Hampshire Department of Health and Human Services (DHHS), Commissioner of DHHS (commissioner), Associate Commissioner of DHHS, and Administrator of the Bureau of Behavioral Health (collectively, the defendants) seeking, in part, to enjoin DHHS from denying the individual plaintiffs the right to obtain Medicaid-funded services from their chosen provider, Harbor Homes.  The plaintiffs appeal rulings of the Superior Court (McNamara, J. and Smukler, J.) denying their summary judgment motions and granting the defendants' cross-motions for summary judgment on two counts in the plaintiffs' petition.  We reverse the trial court's ruling that New Hampshire Administrative Rules, He-M 426.04(a)(2) does not violate the federal Medicaid Act and remand.

I.    Background

Harbor Homes is a non-profit New Hampshire corporation in Nashua that provides independent living and support services (rehabilitative services) to Medicaid-eligible individuals with serious mental illness.  The individual plaintiffs received Medicaid-funded rehabilitative services from Harbor Homes.  DHHS is the state agency responsible for administering the Medicaid program in New Hampshire.  Bel Air Assocs. v. N.H. Dep't of Health & Human Servs., 154 N.H. 228, 229 (2006).

A.  Statutory and Regulatory Framework

1.    Medicaid

The Medicaid program, established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. (Medicaid Act), is a cooperative federal-state program in which the federal government offers funding to states that provide healthcare services to certain individuals who cannot afford to pay their own medical costs (Medicaid program).  See Bel Air Assocs. v. N.H. Dep't of Health & Human Servs., 158 N.H. 104, 105, 108 (2008).  Although state "participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." Harris v. McRae, 448 U.S. 297, 301 (1980).

"Each state designs, implements, and manages its own Medicaid program, with discretion as to the proper mix of amount, scope, and duration limitations on coverage." Planned Parenthood Arizona Inc. v. Betlach, 727 F.3d 960, 963 (9th Cir. 2013) (quotation omitted) (Planned Parenthood of Arizona); see also Dist. of Col. Pod. Soc. v. District of Columbia, 407 F. Supp. 1259, 1263 (D.C. 1975) (explaining that states are given "considerable discretion and

2

latitude in devising their Medicaid Plans"). In designing its Medicaid program, each state "must create its own administrative rules and regulations for operating the Medicaid program in that state." Moore ex rel. Moore v. Reese, 637 F.3d 1220, 1238 (11th Cir. 2011). The discretion afforded to each state in designing its Medicaid program, however, has limits: "To receive Medicaid funding, states must comply with federal criteria governing, among other matters, who is eligible for care, what services must be provided, how reimbursement is to be determined, and what range of choice Medicaid recipients must be afforded in selecting their doctors." Planned Parenthood of Arizona, 727 F.3d at 963.

One of the Medicaid Act's requirements is that state Medicaid programs must allow "any individual eligible for medical assistance" to "obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23)(A) (2012). This is known as the free-choice-of-provider provision. See Planned Parenthood v. Com'r of Dept. Health, 699 F.3d 962, 969 (7th Cir. 2012) (Planned Parenthood of Indiana). This provision affords Medicaid beneficiaries "the right to choose among a range of qualified providers, without government interference." O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 785 (1980). Thus, "[w]hen several qualified providers of a service exist, the state may not dictate where a Medicaid recipient is to receive treatment." King by King v. Sullivan, 776 F. Supp. 645, 655 (D.R.I. 1991). States may establish "reasonable standards relating to the qualifications of providers." 42 C.F.R. § 431.51(c)(2) (2013).

In formulating its Medicaid program, each state may elect to provide certain optional services or may extend services to certain populations that might not otherwise be covered. 42 U.S.C. §§ 1396a(a)(10)(A)(ii), 1396d(a) (2012). When a state provides optional services, it must do so consistent with Medicaid requirements and regulations, including the free-choice-of-provider provision. See Eder v. Beal, 609 F.2d 695, 702 (3d Cir. 1979).

### 2. RSA Chapter 135-C and Accompanying Regulations

DHHS, as the administering agency for New Hampshire's Medicaid program, is responsible for receiving federal funding and ensuring compliance with all of the provisions of the Medicaid Act. See RSA 125:15 (2005); 42 U.S.C. §§ 1396a(a)(5), (6) (2012); 42 C.F.R. §§ 431.10, .16 (2013). New Hampshire's Medicaid program provides optional rehabilitative services such as those provided to the individual plaintiffs in this case. See N.H. Admin. Rules, He-C 6420.04(d)(7); 42 U.S.C. §§ 1396a(a)(10)(A)(ii), 1396d(a)(13); 42 C.F.R. § 440.130(d) (2013).

DHHS is also responsible for establishing, maintaining, and coordinating "a comprehensive, effective, and efficient system of services for persons with mental illness." RSA 135-C:1, I(a) (2005). To that end, "[t]he commissioner may adopt rules, pursuant to RSA 541-A, relative to the requirements for services within the state mental health services system," including, but not limited to, "[q]uality standards for services and treatment provided and quality assurance procedures." RSA 135-C:5, I(c) (2005).

New Hampshire Administrative Rules, Part He-M 426 describe services provided by "community mental health programs" and "community mental health providers" that are reimbursable under the Medicaid program. See N.H. Admin. Rules, He-M 426.01. A "[c]ommunity mental health program" is "a program operated by the state, city, town, or county, or a community based New Hampshire nonprofit corporation for the purpose of planning, establishing, and administering an array of community-based, mental health services pursuant to He-M 403 and as defined in RSA 135-C:2, IV." N.H. Admin. Rules, He-M 426.02(f); see also RSA 135-C:2, IV (2005). "Only [community mental health programs] or their subcontractors shall be authorized to provide the medicaid funded community mental health services described in the[] rules." N.H. Admin. Rules, He-M 426.04(b).

A "[c]ommunity mental health provider" is "a medicaid provider of community mental health services that has been previously approved by the commissioner to provide specific mental health services pursuant to He-M 426." N.H. Admin. Rules, He-M 426.02(g). A "[c]ommunity mental health provider[] approved prior to August 22, 1997 shall be authorized to continue to provide medicaid funded mental health services until the date of expiration of provider status as long as the provider: (1) Is in compliance with applicable rules; (2) Maintains an interagency agreement with the regional [community mental health program] . . . and (3) Maintains a quality assurance plan . . . ." N.H. Admin. Rules, He-M 426.04(a) (emphasis added) (IAA requirement).

B. Procedural History

Since 1991, Harbor Homes has participated in New Hampshire's Medicaid program pursuant to a Medicaid Provider Enrollment Agreement. On June 23, 2008, Harbor Homes entered into an interagency agreement (IAA) with a community mental health program, Community Council of Nashua, NH, now known as Greater Nashua Mental Health Center (GNMHC), which authorized Harbor Homes, as a community mental health provider, to provide certain Medicaid-funded rehabilitative services to GNMHC patients. The purpose of the IAA was to ensure collaborative service planning and delivery, continuity of care between Harbor Homes and GNMHC, with minimal resource duplication, and the provision of twenty-four hour emergency services. See

N.H. Admin. Rules, He-M 426.04(a)(2). By its terms, the IAA was "effective for the period beginning July 1, 2008 and ending on June 30, 2011."

Under the IAA, Harbor Homes provided services to approximately one hundred and sixty individuals with serious mental illness, including the individual plaintiffs in this case. GNMHC is responsible for psychiatry and case management for the individuals served by Harbor Homes as well as preparing and approving individual treatment plans that prescribe the type and level of service needed for the individuals receiving services from Harbor Homes.

In February 2011, Harbor Homes learned that GNMHC did not intend to renew the IAA and that the Medicaid reimbursable services provided by Harbor Homes would be transitioned to GNMHC. Under Rule He-M 426.04(a)(2), because, as of July 1, 2011, Harbor Homes would no longer have an IAA with a community mental health provider, it would no longer be permitted to provide Medicaid funded mental health services to approximately one hundred and forty of its clients, including the individual plaintiffs in this case. See N.H. Admin. Rules, He-M 426.04(a)(2).

On June 28, 2011, the plaintiffs filed a petition for injunctive and declaratory relief, seeking a court order enjoining DHHS from "terminating or limiting Harbor Homes' status as a qualified Medicaid provider" and directing the State to allow the individual plaintiffs to obtain community mental health services from Harbor Homes, the provider of their choice. Following two hearings, the court denied the plaintiffs' request for a preliminary injunction. Thereafter, all parties moved for partial summary judgment on the plaintiffs' claim that DHHS's reliance upon the IAA requirement as a reason to terminate Harbor Homes's status as a qualified Medicaid provider was improper because the requirement is invalid both on its face and as applied in this case. The trial court granted the defendants' motion, in part, and denied the plaintiffs' motion, ruling that the plaintiffs' facial challenge to the validity of the regulation failed as a matter of law because "[t]he IAA requirement relates to administration of the state [Medicaid] plan and qualifications of providers pursuant to the Medicaid Act" and is, therefore, a valid requirement.

The remaining issues were later disposed of by order or voluntary nonsuit without prejudice, and this appeal followed.

## II.    Standard of Review

In reviewing the trial court's rulings on cross-motions for summary judgment, "we consider the evidence in the light most favorable to each party in its capacity as the nonmoving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a

matter of law." Granite State Mgmt. & Res. v. City of Concord, 165 N.H. 277, 282 (2013) (quotation omitted). "If our review of that evidence discloses no genuine issue of material fact and if the moving party is entitled to judgment as a matter of law, then we will affirm the grant of summary judgment." Id. (quotation omitted).

III.    Analysis

Although the plaintiffs advance four arguments on appeal, we need consider only one:  whether DHHS's reliance upon the IAA requirement to disqualify Harbor Homes as a community mental health provider violates the free-choice-of-provider provision of the Medicaid Act.  The plaintiffs contend that the IAA requirement does not relate to a provider's qualifications to perform services and, therefore, violates the free-choice-of-provider provision. The defendants counter that the Medicaid Act permits states to set reasonable standards relating to the qualifications of providers. See 42 C.F.R. § 431.51(c)(2).  They maintain that the IAA requirement is a reasonable standard relating to the qualifications of providers and, therefore, does not run afoul of the free-choice-of-provider provision.

Our review of this issue requires an examination of the pertinent federal statutory and regulatory framework, as well as New Hampshire law implementing that framework in the context of the mental health system.  The interpretation of a statute is a question of law, which we review de novo.  N.H. Assoc. of Counties v. Comm'r., N.H. Dep't of Health & Human Servs., 156 N.H. 10, 15 (2007).  Because the meaning of the free-choice-of-provider provision, 42 U.S.C. § 1396a(a)(23)(A), is a question of federal law, we interpret it in accordance with federal policy and precedent.  Cf. Planned Parenthood of Arizona, 727 F.3d at 968-71; Pelkey v. Dan's City Used Cars, 163 N.H. 483, 487 (2012) (interpreting 49 U.S.C. § 14501(c)(1) (2006) in accordance with federal policy and precedent), aff'd, 133 S. Ct. 1769 (2013).  When interpreting a statute, we begin with the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  See Pelkey, 163 N.H. at 487.  When the language of the statute is clear on its face, its meaning is not subject to modification.  Appeal of Lake Sunapee Protective Ass'n, 165 N.H. 119, 125 (2013).  We will neither consider what Congress might have said, nor add words that it did not see fit to include.  See Planned Parenthood of Arizona, 727 F.3d at 970; cf. Appeal of Lake Sunapee Protective Ass'n, 165 N.H. at 125 (construing state statute).

The plaintiffs argue that the "requirement of maintaining an IAA to be a qualified provider of Medicaid mental health services violates [the free-choice-of-provider] provision because" it does not "relate to the ability of the provider to provide the care."  We agree.

6

The free-choice-of-provider provision requires that state Medicaid plans "must . . . provide that . . . any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23)(A) (emphasis added). The Seventh Circuit Court of Appeals recently interpreted this provision in Planned Parenthood of Indiana. See Planned Parenthood of Indiana, 699 F.3d at 977-80. In that case, Planned Parenthood of Indiana challenged an Indiana defunding law as violating the free-choice-of-provider provision. Id. at 967-68. Indiana argued that, even if the provision conferred on Medicaid recipients the right to choose among a range of qualified providers, "the states may establish provider qualifications that effectively limit that right." Id. at 977-78. The Seventh Circuit disagreed, ruling that Indiana's argument "conflicts with the unambiguous language of § 1396a(a)(23) and finds no support in related Medicaid statutes and regulations." Id. at 978.

The Seventh Circuit noted that "[t]he Act does not define what it means for a provider to be 'qualified,' and the term is not self-defining." Id. It explained that "Medicaid regulations provide that the states may establish 'reasonable standards relating to the qualifications of providers.'" Id. (quoting 42 C.F.R. § 431.51(c)(2)). Nonetheless, "[t]his authority . . . does not suggest that states are free to ascribe any meaning to the statutory term 'qualified' — including a meaning entirely strange to those familiar with its ordinary usage." Id. (quotations omitted). "As the limiting term 'reasonable' in the regulation suggests, a state's authority to determine provider qualifications must be keyed to the permissible variations in the ordinary concept of what it means to be 'qualified' in this particular context." Id. (quotation omitted). The court reasoned that, "[r]ead in context, the term 'qualified' as used in § 1396a(a)(23) unambiguously relates to a provider's fitness to perform the medical services the patient requires." Id. Accordingly, it held that "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." Id.

Subsequently, the Ninth Circuit agreed with the Seventh Circuit's interpretation. See Planned Parenthood of Arizona, 727 F.3d at 969. In doing so, it found that Congress removed "any doubt as to how [to] read the word 'qualified' in" the free-choice-of-provider provision when it added "the further specification 'qualified to perform the service or services required.'" Id. (quoting 42 U.S.C. § 1396a(a)(23)(A)). It reasoned that "the words 'to perform the service or services required' modify the adjective 'qualified,' telling us that Congress meant for that adjective not to refer to a Medicaid Act-specific authorization, but to denote the capability to carry out a particular activity — 'performing the medical service' that a given Medicaid recipient requires." Id. (brackets omitted). "The provision thus indexes the relevant 'qualifications' not to any Medicaid-specific criteria (whether imposed by the federal government or the

7

states), but to factors external to the Medicaid program; the provider's competency and professional standing as a medical provider generally." Id.

We agree with both the Seventh and the Ninth Circuits that, when read in context, "the term 'qualified' as used in § 1396a(a)(23) unambiguously relates to a provider's fitness to perform the medical services the patient requires." Planned Parenthood of Indiana, 699 F.3d at 978; see also Planned Parenthood of Arizona, 727 F.3d at 969. As the Ninth Circuit explained, "The verb 'perform' here is key: It confirms that the relevant question is not whether the provider is qualified in some sense specific to Medicaid patients, but simply whether the provider is qualified in a general sense to perform, i.e., carry out, the service in question, whether for Medicaid patients or for any other patients." Planned Parenthood of Arizona, 727 F.3d at 969.

The defendants argue that "[w]hat it means to be a qualified provider is not controlled by the Medicaid Act; rather, the federal government has left it to the States to set reasonable standards relating to the qualifications of providers." There is no dispute "that the states retain considerable authority to establish licensing standards and other related practice qualifications for providers," and that "this residual power is inherent in the cooperative-federalism model of the Medicaid program and expressly recognized in the Medicaid regulations." Planned Parenthood of Indiana, 699 F.3d at 980; see also 42 C.F.R. § 431.51(c)(2). Further, the free-choice-of-provider provision "cannot prevent the State from adopting administrative processes that are necessary for allocating and delivering its limited medical assistance funds efficiently." King by King, 776 F. Supp. at 656 (concluding that Rhode Island's practice of matching applicants for private intermediate care facilities to appropriate intermediate care facilities and group homes was necessary practice and did not violate free-choice-of-provider provision). The defendants' interpretation, however, would permit states to "determine for any reason that a provider is not qualified for Medicaid purposes, even if the provider is otherwise legally qualified, through training and licensure, to provide the requisite medical services within the state." Planned Parenthood of Arizona, 727 F.3d at 970.

"Nowhere in the Medicaid Act has Congress given a special definition to 'qualified,' much less indicated that each state is free to define this term for purposes of its own Medicaid program however it sees fit." Id. Moreover, were we to adopt the defendants' interpretation, we would detach "the word 'qualified' from the phrase in which it is embedded; 'qualified to perform the service or services required.'" Id. This we will not do. See id.

The defendants' reliance upon Warr v. Horsley, 705 F. Supp. 540 (M.D. Ala. 1989) and District of Columbia Podiatry Society is misplaced. In Warr, the United States District Court for the Middle District of Alabama concluded that,

8

since "Alabama has not chosen to include podiatric care in its [Medicaid] plan," podiatrists were excluded from the terms of the free-choice-of-provider provision and were, therefore, "not entitled to receive reimbursement under Medicaid for their services unless the state [chose] to include podiatric care in its plan as an optional service." Warr, 705 F. Supp. at 544.

Similarly, in District of Columbia Podiatry Society, the United States District Court for the District of Columbia determined that the District of Columbia had the discretion to impose limitations on the scope of the optional podiatric care services it offered under its Medicaid plan and was not required to fund all services that a licensed podiatrist could legally perform. Dist. of Col. Pod. Soc., 407 F. Supp. at 1263-66. The court reached this conclusion based, in part, upon "the [federal] Medicaid regulations . . . [which do] not require that podiatrists or any other medical care provider be compensated for every procedure or service they may legally perform." Id. at 1264-65. The court interpreted the phrase "qualified to perform the service" in the free-choice-of-provider provision as meaning "that a provider is 'qualified' if the service is one compensable under the State Plan." Id. at 1266 n.32. Since the podiatry services for which the plaintiffs sought reimbursement were not compensable under the District of Columbia's Plan when performed by a podiatrist, the free-choice-of-provider provision did not entitle a Medicaid recipient to obtain assistance from a podiatrist for those services. See id. Thus, these cases addressed services that were not reimbursable under Medicaid because the respective states had chosen not to include such services in their Medicaid plans.

New Hampshire's Medicaid plan, however, includes optional rehabilitative services such as those at issue in this case, see N.H. Admin. Rules, He-C 6420.04(d)(7); 42 U.S.C. §§ 1396a(a)(10)(A)(ii), 1396d(a)(13); 42 C.F.R. § 440.130(d), and the defendants do not contend that these services are limited or in any way not covered under New Hampshire's Medicaid Program. Since New Hampshire has elected to provide rehabilitative services, "it bound itself to act in compliance with [the Medicaid Act] and the applicable regulations in the implementation of those services." Meyers by Walden v. Reagan, 776 F.2d 241, 243-44 (8th Cir. 1985) (concluding that Iowa could not exclude electronic speech devices from coverage under its plan once it chose to offer "physical therapy and related services"); see also Harris, 448 U.S. at 301; Eder, 609 F.2d at 702. This includes complying with the free-choice-of-provider provision. See Eder, 609 F.2d at 702. Although states have the authority to adopt "reasonable standards relating to the qualifications of providers," 42 C.F.R. § 431.51(c)(2), these standards must relate to the ability of the provider to perform the Medicaid services in question, i.e., "the provider's fitness to render the medical services required," Planned Parenthood of Indiana, 699 F.3d at 980.

9

The defendants contend that the IAA requirement is reasonable because it "ensures collaborative service planning and delivery to provide continuity of care in a manner that is efficient and effective." They contend that "[t]he sharing of information required by the [IAA] ensures that the diagnosis, development of an individualized service plan, and the provision [of] services is based upon the full complement of information about the individual's clinical needs and current level of functioning." Thus, according to the defendants, because the collaboration provided by an IAA is necessary to "serve[] the best interests of the clients to whom services are provided," the IAA requirement has a rational basis and is a reasonable standard relating to the quality of care.

We do not doubt the importance of having a mental health system that assures quality of services to its recipients and collaboration of care in providing those services. But the defendants' argument fails to explain how the IAA requirement directly relates to "the <u>provider's</u> fitness to render the medical services required." <u>Id</u>. (emphasis added); <u>cf</u>. <u>Young v. Jesson</u>, 796 N.W.2d 158, 161, 164-69 (Minn. Ct. App. 2011) (concluding that, under applicable regulatory framework, fact that assisted-living and memory care facility did not have contract with county did not mean it was not "qualified provider" under free-choice-of-provider provision). As explained above, "[t]o be 'qualified' in the relevant sense is to be capable of performing the needed medical services in a professionally competent, safe, legal, and ethical manner." <u>Planned Parenthood of Indiana</u>, 699 F.3d at 978. Currently, the IAA requirement in Rule He-M 426.04(a)(2) makes the ability of a community mental health provider to provide Medicaid-funded mental health services dependent upon whether it has an IAA with a community mental health program, rather than upon its "capab[ility] of performing the needed medical services in a professionally competent, safe, legal, and ethical manner," <u>Planned Parenthood of Indiana</u>, 699 F.3d at 978.

Here, the IAA requirement excludes Harbor Homes from Medicaid for a reason unrelated to its fitness to provide the requisite services. Accordingly, we conclude that the trial court erred in ruling that the IAA requirement does not violate the Medicaid Act's free-choice-of-provider provision, and remand for further proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

HICKS and BASSETT, JJ. , concurred.