Department of Labor
No. 2007-411

## APPEAL OF JAMES GEEKIE & a.
### (New Hampshire Department of Labor)

Argued: February 14, 2008
Opinion Issued: April 22, 2008

*Chubrich & Harrigan, P.A.*, of Portsmouth (*Michael E. Chubrich* on the brief and orally), for the petitioners.

*The Wagner Law Group, PC*, of Boston, Massachusetts (*Debra Dyleski-Najjar* and *Stephanie V. Rosseau* on the brief, and *Ms. Dyleski-Najjar* orally), for the respondent.

HICKS, J. The petitioners, James Geekie, William Roach, III, William Roach, IV, James Roach, Robin Hughes, Richard Cornish, Brian Manougian and Mark Warrington, appeal a decision of the New Hampshire Department of Labor (DOL) dismissing their claims under the Whistleblowers' Protection Act (the Act), RSA chapter 275-E (1999 & Supp. 2007). The respondent, Pease Development Authority, Division of Ports and Harbors (division), cross-appeals. We affirm.

The following facts, which were either found by the DOL hearing officer or are supported by the record and consistent with DOL's findings and rulings, are recited here for background purposes. The Pease Development Authority (authority) is a public instrumentality and "body politic and corporate of the state," RSA 12-G:3, I (2003), created in 2001 by RSA 12-G:3 (2003) to carry out the provisions of RSA chapter 12-G (2003 & Supp. 2007). RSA 12-G:43, I (Supp. 2007) established within the authority the division which, among other things, succeeded to the "former functions, duties, and responsibilities of the [New Hampshire] port authority," RSA 12-G:42 (Supp. 2007), which had been established pursuant to Laws 1957, 262:1, *see* RSA 12-G:2, XIX (2003).

The respondents are all members of the International Longshoreman's Union, Local 1947 (ILA). Petitioner Roach, III, is also employed part-time by the division as a harbormaster. ILA has been the historic labor force for line handling at the Market Street Marine Terminal/Port of Portsmouth. Petitioner Roach, III, testified that for forty years prior to July 2006, ILA provided line handling for every ship docking at the port.

Prior to the creation of the division, its predecessor, the New Hampshire Port Authority, contracted with a stevedore company to act as terminal operator and provide stevedoring services, including line handling, at the Market Street Marine Terminal. John T. Clark Company (John T. Clark) held the contract prior to August 1998, and Bulk Loader, LLC (Bulk Loader) held the contract from that point until the contract's expiration in August 2000. Bulk Loader's contract was the last given by the State for exclusive rights to perform stevedoring services at the Market Street Marine Terminal.

ILA line handlers were employed by John T. Clark and Bulk Loader during the respective times those companies held the contract to operate the terminal. The stevedore companies gave the line handlers their work orders and issued their paychecks.

According to testimony of Geno Marconi, director of the division, after the expiration of Bulk Loader's contract with the State, Bulk Loader continued to employ line handlers until its insurance coverage was about to terminate. At that point, a representative of Bulk Loader "informed [the division] that they were not going to renew their insurance policies, and therefore, were not going to cover line handling anymore." Testimony before the hearing officer indicates that during roughly the same time period, ILA solicited William Kennedy to start a company to act as a pay agent so that ILA members could continue to work as the line-handling labor force at the Market Street Marine Terminal. Kennedy founded Portsmouth Shipping and Cargo Handling to provide line-handling labor at the Market Street Marine Terminal. At some point, Portsmouth Shipping and Cargo Handling ceased its role as pay agent and a company called Port City Stevedore and Line Handling, LLC (Port City) took over that function. It paid the ILA workers their wages, withheld taxes and issued W2 statements.

On June 15, 2006, petitioners Roach, III, and Geekie participated in an investigation by the attorney general, giving, as alleged in their whistleblowers' complaint, "sworn, recorded testimony that [the Governor's nominee for director of the division, Geno] Marconi, was incompetent, not qualified to serve as Port Director, and had repeatedly violated [RSA chapter 354-A, the Law Against Discrimination]."

On July 14, 2006, a ship owned by Grimmel Industries, LLC arrived at the port and ILA line handlers did not perform the tie-up. Petitioner Roach, III, testified that he was told "we weren't coming in" and that "[t]here was another company that had taken over line handling."

In September 2006, the petitioners filed a whistleblowers' complaint with DOL, alleging that they were employees of the division, and that they had "suffered the loss of wages [in specified amounts] as punishment for the good faith participation of [petitioners] Geekie and Roach[, III] in the investigation and inquiry regarding" Marconi. The petitioners alleged that the division "allowed Nominee Marconi to induce Grimmel Industries LLC to breach" a contract that "requires the employment of [petitioner] ILA linehandlers whenever Grimmel's vessels dock at the [division's] Market Street Marine Terminal."

On March 5, 2007, DOL held a hearing to determine whether: (1) the petitioners are employees of the division; (2) the petitioners have standing, where it appeared that only two of them actually reported or participated in the governmental inquiry, but the alleged retaliation affected all of them; and (3) the whistleblower claims are preempted by the National Labor Relations Act and/or the Labor Management Relations Act, and the Supremacy Clause of the United States Constitution.

The DOL hearing officer found:

> The [petitioners] were not employees of [the division]. They were, instead, employees of Port City Stevedore & Line Handling, LLC and its predecessors, at all times. The [petitioners] described this use of a "buffer" or "pay agent" as a "paper wall" between the union and [the division]. Regardless of the thickness, there was a "wall" between the union and [the division]. . . . At no time did [the division] "employ[ ] any person" for line handling and they, therefore, are not found to be the employer of the [petitioners].

The hearing officer further found that the petitioners "who did not actually make a complaint" lacked standing under the Act. Finally, the hearing officer found "no clear proof of any Federal preemption at this point in the proceedings." The hearing officer dismissed the petitioners' complaints.

On appeal, our standard of review is governed by RSA 541:13 (2007). *See Appeal of Northeast Rehab. Hosp.*, 149 N.H. 83, 84 (2003); RSA 275-E:4, II (1999) (DOL decisions in whistleblower cases "may be appealed pursuant to RSA 541"). "Accordingly, we will reverse the agency only if it made an error of law or if we are satisfied, by a clear preponderance of the evidence, that the agency's order was unjust or unreasonable." *Northeast Rehab.*, 149 N.H. at 84-85 (quotation omitted). "The agency's factual findings . . . are

presumed to be *prima* facie lawful and reasonable and this presumption may be overcome only by a showing that there was no evidence from which the agency could conclude as it did." *Appeal of Leonard*, 147 N.H. 590, 594 (2002) (quotation and brackets omitted).

█ RSA 275-E:1, I (Supp. 2007) provides, in relevant part, that the term " 'Employee' means and includes every person who may be permitted, required, or directed by any employer, in consideration of direct or indirect gain or profit, to engage in any employment." The term "Employer" is defined by RSA 275-E:1, II (1999) to "mean[ ] an individual, partnership, association, corporation, legal representative, trustee, receiver, trustee in bankruptcy, governmental entity, and any common carrier who employs any person. Employer shall include any person acting in the interest of an employer directly or indirectly." In *Appeal of Northeast Rehabilitation Hospital*, we noted that "RSA 275-E:2, I(a) clearly protects only an 'employee' from prohibited actions of an employer." *Northeast Rehab.*, 149 N.H. at 85. We therefore concluded that "the plain meaning of the term 'employee' as used in the Act encompasses only persons currently employed by the employer." *Id.* at 86.

The petitioners argue that DOL erred in determining that the division was not their employer as defined by RSA 275-E:1, because:

> █ as Terminal Operator it retained control over all labor required to dock and release ships, [2] because it permitted the [petitioners] and other ILA members to perform line-handling labor prior to July 14, 2006, and [3] because it 'indirectly' employed the [petitioners] by instructing port customers to pay wages as a separate fee.

We address each contention in turn.

The petitioners assert that in 2001, the division began acting as the terminal operator at the Market Street Marine Terminal, "an economic activity that has always required the labor of line-handlers like the [petitioners]." The petitioners further argue that "[the division] admitted that it intentionally performed and conducted its Terminal Operator business without employees to perform essential labor: in the words of . . . Port Director [Marconi]: 'The State of New Hampshire is the terminal operator but we sub everything out.' " They contend that they "continued to perform the necessary labor to dock and release ships at the employer's place of business, under the [the division's] observation and ultimate control."

█ Even taking these assertions as true, they merely place the division in the position of a general contractor on a jobsite. We agree with the

Washington Court of Appeals that "[c]ontrol over the jobsite does not, however, confer control over the employment of a subcontractor's workers. Appellants do not explain how an owner/contractor is to carry out a duty to refrain from retaliatory discharge of workers employed by subcontractors." *Awana v. Port of Seattle*, 89 P.3d 291, 293 (Wash. Ct. App. 2004), *review denied*, 108 P.3d 1228 (Wash. 2005).

The petitioners also appear to contend that the division exercised control over the performance of their work and the authority to fire line handlers. They note that petitioners "Roach III and Geekie testified that Port Director Marconi, or his assistants, directed and controlled how the line-handlers performed their labor, and on at least one occasion Port Director Marconi exercised that power to fire one particular line-handler."

This evidence, however, was not uncontroverted. Marconi denied that the division directs and controls performance of the line handlers' work. Rather, he testified that while either he or the division's operations manager, Al Cummings, is often at the dock when a ship is berthing, it is in the role of property manager, "mak[ing] sure that there are no activities that are conducted down there that are detrimental to the property." He further testified that "[w]hen a ship is approaching the dock someone from the Port, either myself or Al Cummings, would have a handheld radio with which we establish contact with the pilot who is guiding the vessel in." He explained: "[W]e are the communications network between the pilot and the line handlers on the dock" and that he or Cummings would use the radio to "relay[ ] the instructions of the pilot down to the line handlers."

■ The hearing officer found that "[t]he direction asserted by the [petitioners] from [the division] was merely to pass through instructions from ships' pilots." The question whether a putative employer exercises direction and control over a putative employee is one of fact. *See McCarthy v. Souther*, 83 N.H. 29, 37-38 (1927), *overruled on other grounds by Dane v. MacGregor*, 94 N.H. 294 (1947) *and Hunter v. R.G. Watkins & Son, Inc.*, 110 N.H. 243 (1970). DOL's finding on this issue is "presumed to be *prima facie* lawful and reasonable," *Appeal of Leonard*, 147 N.H. at 594, and the petitioners have not shown that "there was no evidence from which [DOL] could conclude as it did," *id.* (quotation omitted).

■ Similarly, Marconi denied having ever fired a line handler. "As a fact-finder, the hearing officer was at liberty to accept or reject the testimony before him as he saw fit and his conclusions are entitled to great weight." *Appeal of Regenesis Corp.*, 156 N.H. 445, 451 (2007). Thus, the hearing officer was free to credit Marconi's denial and reject contrary testimony.

The petitioners argue that they meet the definition of employees of the division because the division " 'permitted' [them] to earn their wages at the Port of Portsmouth by issuing identity badges to each of the eight [petitioners]" that allowed them to "enter the port security gate to tie up and let go" ships docking at the port. They contend that the "undisputed evidence demonstrates that the [division], through its Port Director, exercised the power to 'permit' or exclude individual line-handlers from entering the Port of Portsmouth to earn their wages."

The testimony before DOL indicated that for security reasons, only authorized persons were permitted to enter the Market Street Marine Terminal beyond the guard shack. Marconi testified that persons would be authorized to enter "[i]f they have business to conduct at the Port Terminal, and that business is approved." Marconi indicated that while a driver's license was usually sufficient identification for someone having business with a tenant at the terminal, such as a scrap company or salt company, security "procedures are ramped up a little bit more" when a ship is in. Accordingly, Marconi testified, the division would "generally ask the steamship agent to provide us with a list of who may be making deliveries" to the ship. Marconi stated that the division itself issued identification badges, such as those issued to the petitioners, "[t]o facilitate employees of companies that did regular business at the Port Terminal ease of access in and out of the gate." We note that the division introduced applications for the identification badges from four of the petitioners (Geekie, Roach, III, Roach, IV and Hughes), signed by each of them respectively and listing Port City as their employer.

We do not read the term "permitted" in RSA 275-E:1, I, so broadly as to encompass the mere security clearance at issue here. The United States Supreme Court, interpreting similar language in the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (2000), noted that "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). In *Legg v. Johnson, Simmerman & Broughton*, 576 S.E.2d 532 (W. Va. 2002), the Supreme Court of Appeals of West Virginia reasoned that the language "any person suffered or permitted to work by a person, firm or corporation," *Legg*, 576 S.E.2d at 537 (quotation omitted), should not "be taken so literally as to reach an absurd result," *id.* at 538.

> For instance, the Court does not believe that the Legislature intended that one who rents an office from a landlord, and who becomes involved in a monetary dispute with the landlord, should be considered an "employee" of the landlord under the Wage

Payment and Collection Act simply because the landlord suffers or permits the individual to work out of the rented office.

*Legg*, 576 S.E.2d at 538.

■■ This court also "will not interpret statutory language in a literal manner when such a reading would lead to an absurd result." *Cayten v. N.H. Dep't of Envtl. Servs.*, 155 N.H. 647, 653 (2007). We do not believe that the legislature intended that the issuance of identification badges, in order to expedite security clearance, to persons doing regular business at the port terminal, would render such persons, be they line handlers or persons delivering fuel or provisions to the ships, employees of the division for purposes of the Act.

The petitioners next assert that their "nominal employer after 2001 was merely a pay agent," and that "[t]hrough the use of 'pay agents', the [division] conducted the business of a Terminal Operator, thereby 'indirectly' acting 'in the interest of an employer' within the scope of" RSA 275-E:1. The division argues that "as a matter of law, [it] is not a 'person' acting in the interest of Port City, the [petitioners'] employer, nor is there any evidence of any relationship—contractual or otherwise—between Port City and the [division]."

■ DOL's factual findings support the division's position. The hearing officer found that the petitioners "were directed by ships' agents, not [the division]. The ships' agents were the ones who contracted with the union to perform line handling tasks, not [the division]." The record supports this finding. Marconi testified that "all the arrangements in a port are handled by the agent for the ship." Thus, "[t]he steamship agent calls various entities, the pilots, arranges piloting for the ship into the harbor; contacts U.S. Customs" and also contacts the division "on the availability of the berth." In addition, the steamship agent secures line handling and stevedore services for the ship. Marconi testified that there are no contractual arrangements between line handling companies and the division and that shipping agents are free to hire any company that is able to provide "evidence of insurance."

This evidence was largely confirmed by the testimony of petitioner Roach, III, who stated:

> Ship's agent works on behalf of the ship, the ship owner. And when the ship comes in, they see to it that any needs of the vessel are met: if they need fuel. If they need water; ship's stores.
>
> And it also encompasses the line handling services. That is paid for by the ship owner, and he also handles the transactions with

the terminal operator and stevedore for paying the wages and the State charges, as well, the dockage and wharfage, and so forth.

■ The petitioners make much of evidence that Marconi, in the petitioners' words, "instructed the [the division's] potential customers to deal with" ILA. Marconi testified:

We have, in the past, and even in the present, we have told people that have come to our terminal, that there is a historic labor force that has been working in the area. These are their names and phone numbers. You need to contact them and see if you could work something out.

Such evidence, however, did not compel the hearing officer to conclude that the division was acting in the interest of the petitioners' employer, Port City.

■ The petitioners next argue that DOL erred in failing to apply the "common law of agency to find and rule that the division, as the principal of the [petitioners'] pay agent, had the equivalent of a direct employment contract with the [petitioners]." The division counters that because the term "employer" is defined in the Act, "the statutory definition must be applied rather than the 'common law.'" We agree with the division. "Generally, courts interpret words and phrases that are defined in the common law according to their common-law meanings, *unless* defined by the statute in which they appear." *In re Diana P.*, 120 N.H. 791, 794 (1980) (emphasis added), *cert. denied*, 452 U.S. 964 (1981), *overruled on other grounds by In re Craig T.*, 147 N.H. 739 (2002). We will not substitute the common law of agency for the statutory definition of "employee" to extend the reach of the Act. *Cf. State v. Elementis Chem.*, 152 N.H. 794, 803 (2005) (declining to apply common law definition where, "[b]y defining 'abandoned material,' the administrative rule abrogates the common law definition of 'abandoned'").

For the foregoing reasons, we conclude that DOL did not err in finding that the division did not employ any of the petitioners for purposes of these whistleblower claims. We note that the hearing officer found that petitioner "Roach III agreed, at the hearing, that his Whistleblower's Complaint was not related to his part time employment with [the division] as a harbormaster." As the petitioners' failure to prove their employee status disposes of their whistleblower claims, we need not address their challenge to the DOL's ruling on the standing issue. In addition, because the division

concedes that its cross-appeal becomes moot if we affirm on the employment issue, we need not reach its cross-appeal.

*Affirmed.*

BRODERICK, C.J., and DALIANIS, DUGGAN and GALWAY, JJ., concurred.