Wetlands Council
No. 2012-255

APPEAL OF LAKE SUNAPEE PROTECTIVE ASSOCIATION & a.
(New Hampshire Wetlands Council)

Argued: February 7, 2013
Opinion Issued: June 28, 2013

120

*McLane, Graf, Raulerson & Middleton, PA*, of Concord (*Gregory H. Smith* on the joint brief and orally), for petitioner Lake Sunapee Protective Association.

*Upton & Hatfield, LLP*, of Portsmouth (*Justin C. Richardson* on the joint brief and orally), for petitioner Town of Newbury.

*Michael A. Delaney*, attorney general (*Evan J. Mulholland*, assistant attorney general, on the brief and orally), for the respondent.

DALIANIS, C.J. The petitioners, Lake Sunapee Protective Association and Town of Newbury, appeal a New Hampshire Wetlands Council decision. The Wetlands Council upheld the grant by New Hampshire Department of Environmental Services (DES) of a shoreland impact permit to the respondent, New Hampshire Department of Fish and Game (F&G), to construct a two-ramp public boat launch with parking on the State's "Wild Goose Property," located on the shore of Lake Sunapee. The petitioners contend that it was error to uphold DES's decision because DES violated two provisions of the Comprehensive Shoreland Protection Act, now called the Shoreland Water Quality Protection Act (the Act). *See* RSA ch. 483-B (2001 & Supp. 2012). They argue that DES contravened RSA 483-B:9, IV-b (Supp. 2012) by issuing a permit that was neither necessary nor consistent with the purposes of RSA chapter 483-B and other state law. They also argue that DES violated RSA 483-B:3, II (2001) by failing to enforce a local shoreland setback. We affirm.

*I. Background*

The following facts were found by the Wetlands Council, or are otherwise part of the certified record. The Wild Goose Property consists of approximately 135 acres of land in Newbury. It abuts Sunapee State Park and includes a 3.3-acre site along the southwestern shore of Lake Sunapee. The property was formerly the site of the "Wild Goose" cabins.

The State acquired the property in 1990 through its Land Conservation Investment Program, specifically to provide public boat access to Lake Sunapee. *See* RSA 162-C:6-:7, :10-:11 (2002), :8-:9 (Supp. 2012); *Town of Newbury v. N.H. Fish and Game Dep't*, 165 N.H. 142, 143 (2013). F&G manages the property. *See* RSA 233-A:4 (2009) (F&G is charged with carrying out the statewide public boat access program).

In 2004, the New Hampshire Public Water Access Advisory Board (PWAAB) formally advised F&G to develop the 3.3-acre site for public boat access to Lake Sunapee based upon its determination that such access was needed. *See* RSA 233-A:2, II (2009). On December 17, 2008, F&G applied to DES for the necessary permits to construct the boat launch. In support of those applications, F&G submitted a detailed report describing the project. The report explained that the project "was developed to provide public unlimited powerboat access to Lake Sunapee, thereby fulfilling the mandates of the 1991 . . . 'Public Access Plan for New Hampshire's Lakes, Ponds, and Rivers,'" published by the New Hampshire Office of State Planning. The report observed that "[p]ublic boat access to Lake Sunapee is currently limited to municipal, private and State-owned fee based facilities."

The report stated that, "during the decade-long planning process," F&G had reviewed numerous "alternative access sites and [a] No-Build Alternative . . . to determine if a more suitable site was available." "The Alternatives Analysis focused on evaluating the environmental conditions, design constraints and costs for alternative public access sites . . . ." An appendix described the analysis in depth.

The report noted that the project did not meet two of the minimum shoreland protection standards set forth in RSA 483-B:9, V (Supp. 2008). First, it did not meet the requirement that within each "50 by 50 foot" segment of waterfront buffer, "a minimum combined tree and sapling score of at least 50 points shall be maintained." RSA 483-B:9, V(a)(2)(D). According to the report, "[f]ive of the 16 Waterfront Buffer blocks on this site will have their tree point count diminished during construction, and in three of these, construction will lower the tree point count below 50 points." Although F&G planned to add "[m]itigation plantings," which would increase the tree count of the affected segments, one segment would be

"irrevocably reduced below 50 points." Second, the project did not meet the requirement that fifty percent of the vegetation within the "natural woodland buffer" be "unaltered." RSA 483-B:9, V(b)(2)(A)(ii).

DES issued the permit on January 7, 2009, after making the following findings:

1. The New Hampshire Office of State Planning (OSP) Public Access Plan for New Hampshire's Lakes, Ponds, and Rivers mandated in 1991 that the state of New Hampshire was to provide the public with unlimited powerboat access to Lake Sunapee.

2. RSA [chapter] 255-A designates [F&G] as the lead agency for boating access within the state and created the Statewide Public Boat Access Program to provide adequate, safe, and environmentally sound public boat access to waters of the state.

3. [F&G] conducted a 30 parameter analysis comparing 13 prospecti[ve] sites. Alternatives to the current site were not selected because they would not provide adequate, safe access to Lake Sunapee and, therefore, would not meet the aforementioned mandates.

4. The purpose and intent of RSA [chapter] 483-B is to fulfill the state's ro[le] as trustee of its waters and to promote public health, safety, and the general welfare by providing for economic development in proximity to the water, conserving shoreline cover and points of access to inland and coastal waters, and protecting public use of waters and recreation.

5. [DES] finds that plans [submitted with F&G's application] provide sufficient evidence to meet the aforementioned purpose and intent of RSA [chapter] 483-B.

The permit allows F&G to alter 80,500 square feet of the site to construct "a 2-ramp public boat launch with parking facilities for approximately 31 car/trailers and 12 car top spaces." The permit is contingent upon approval of an alteration of terrain permit and wetland impact permit, and requires the installation of erosion and siltation control measures. The plans approved by the permit did not show the local shoreland setback of seventy-five feet. *See* N.H. ADMIN. RULES, Env-Wq 1406.09(f) (plans must show "[a]ll . . . applicable local and state setbacks"). The petitioners appealed the grant of the permit to the Wetlands Council.

In April 2009, F&G requested that DES amend the permit. DES issued the amended permit on May 22, 2009. The amended permit allows "[n]o more than 5.9% of the area of the lot within the protected shoreland [to] be covered with impervious surfaces," unless F&G obtains additional DES

approval. *See* RSA 483-B:4, VII-b (Supp. 2012) (defining "impervious surface" as "any modified surface that cannot effectively absorb or infiltrate water," such as "paved, gravel, or crushed stone driveways, parking areas, and walkways"). Currently, 5.6% of the lot is covered by impervious surfaces.

Thereafter, DES issued a wetlands impact permit to F&G, and the petitioners appealed this decision to the Wetlands Council as well. The Wetlands Council heard the appeals of the shoreland impact permit and the wetlands impact permit at a four-day consolidated evidentiary hearing. After deliberating for another four days, the Wetlands Council issued a single decision denying the appeal of the wetlands impact permit, and denying the appeal of the shoreland impact permit except as to a ground that is not at issue in this appeal. The Wetlands Council found that there was no "reasonable way to construct a boat ramp on the site" that complied with all of the minimum standards set forth in RSA 483-B:9, V — according to the Wetlands Council, "[t]here is no way to build a boat ramp on the site while still complying with the 50 point rule." *See* RSA 483-B:9, V(a)(2)(D). The petitioners unsuccessfully moved for reconsideration, and this appeal followed.

## II. Analysis

Our standard of review of the Wetlands Council's decision is set forth in RSA 541:13 (2007). *Appeal of Garrison Place Real Estate Inv. Trust,* 159 N.H. 539, 541 (2009); RSA 21-O:14, III (2012). Under RSA 541:13, all of the findings of fact of the Wetlands Council "shall be deemed to be prima facie lawful and reasonable." The petitioners have the burden of demonstrating that the Wetlands Council's decision was "clearly unreasonable or unlaw-ful." RSA 541:13. We must uphold the Wetlands Council's decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence before us, "that such order is unjust or unreasonable." *Id.*

For its part, the Wetlands Council must "determine whether the . . . decision [by DES] was unlawful or unreasonable by reviewing the admin-istrative record together with any evidence and testimony the parties to the appeal may present." RSA 21-O:14, I-a (2012) (amended 2012), :5-a, V (2012). The Wetlands Council's appeal hearings are "adjudicative proceed-ings." RSA 21-O:14, II (2012).

The petitioners argue that DES failed to comply with RSA 483-B:9, IV-b and RSA 483-B:3, II. They contend, accordingly, that the Wetlands Council erred when it ruled that DES's decision to grant the permit was reasonable and lawful.

Resolving these issues requires statutory interpretation. We review an agency's statutory interpretation *de novo. See N.H. Dep't of Envtl. Servs.*

*v. Marino*, 155 N.H. 709, 713 (2007). We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. *Id.* We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *Id.* When the language of the statute is clear on its face, its meaning is not subject to modification. *Id.* We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.* Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *Id.*

We consider the version of the Act in effect in 2009, when DES issued the permit at issue. The Act is "aimed at protecting the state's shoreland as well as its public waters." *Id.* It is intended to control the use of public waters and "adjacent shoreland for the greatest public benefit." RSA 483-B:1, II (Supp. 2012). Control by the State prevents "uncoordinated, unplanned and piecemeal development along the state's shorelines, which could result in significant negative impacts on the public waters of New Hampshire." RSA 483-B:1, IV (Supp. 2012). Accordingly, RSA 483-B:3, I (2001) provides that "[s]tate and local permits for work within the protected shorelands shall be issued only when consistent with the policies of [RSA] chapter [483-B]." "When the standards and practices established in [RSA] chapter [483-B] conflict with other local or state laws and rules, the more stringent standard shall control." RSA 483-B:3, II. Pursuant to RSA 483-B:5-b, I(a) (Supp. 2012) (amended 2011), "[n]o person shall commence construction, excavation, or filling activities within the protected shoreland without obtaining a permit from [DES] to ensure compliance with [RSA] chapter [483-B]."

RSA 483-B:9, V sets forth "[m]inimum [s]horeland [p]rotection [s]tandards," which are "designed to minimize shoreland disturbance so as to protect the public waters, while still accommodating reasonable levels of development in the protected shoreland." RSA 483-B:9, I (2001). The standards are intended to serve sixteen goals:

I. Further the maintenance of safe and healthful conditions.

II. Provide for the wise utilization of water and related land resources.

III. Prevent and control water pollution.

IV. Protect fish spawning grounds, aquatic life, and bird and other wildlife habitats.

V. Protect buildings and lands from flooding and accelerated erosion.

VI. Protect archaeological and historical resources.

VII. Protect commercial fishing and maritime industries.

VIII. Protect freshwater and coastal wetlands.

IX. Control building sites, placement of structures, and land uses.

X. Conserve shoreline cover and points of access to inland and coastal waters.

XI. Preserve the state's lakes, rivers, estuaries and coastal waters in their natural state.

XII. Promote wildlife habitat, scenic beauty, and scientific study.

XIII. Protect public use of waters, including recreation.

XIV. Conserve natural beauty and open spaces.

XV. Anticipate and respond to the impacts of development in shoreland areas.

XVI. Provide for economic development in proximity to waters.

RSA 483-B:2 (Supp. 2012) (amended 2011).

One of the minimum shoreland protection standards concerns maintaining a waterfront buffer; another concerns maintaining a natural woodland buffer. *See* RSA 483-B:9, V(a), (b). The purpose of the waterfront buffer is "to protect the quality of public waters while allowing homeowner discretion with regard to water access, safety, viewscape maintenance, and lot design." RSA 483-B:9, V(a)(1). The purpose of the natural woodland buffer is "to protect the quality of public waters by minimizing erosion, preventing siltation and turbidity, stabilizing soils, preventing excess nutrient and chemical pollution, maintaining natural water temperatures, maintaining a healthy tree canopy and understory, preserving fish and wildlife habitat, and respecting the overall natural condition of the protected shoreland." RSA 483-B:9, V(b)(1). To achieve these purposes, the Act contains specific requirements for retaining vegetation within the waterfront and natural woodland buffers. *See* RSA 483-B:9, V(a)(2)(B)-(D) (waterfront), V(b)(2) (woodland).

Under the Act, certain facilities "shall be permitted by the commissioner [of DES] as necessary . . . consistent with the purposes of [RSA] chapter [483-B] and other state law." RSA 483-B:9, III, IV, IV-a (2001), IV-b. The facilities DES "shall" permit are: (1) "[p]ublic water supply facilities," RSA 483-B:9, III; (2) "[p]ublic water and sewage treatment facilities," RSA 483-B:9, IV; (3) "[h]ydro electric facilities," RSA 483-B:9, IV-a; (4) "[p]ublic utility lines and associated structures and facilities," RSA 483-B:9, IV-b; (5) "public roads," *id.*; and (6) "public water access facilities, including boat ramps," *id.*

## A. RSA 483-B:9, IV-b

■ We first address the petitioners' arguments regarding RSA 483-B:9, IV-b, which provides that DES "shall" issue permits for "public water access facilities," such as the boat ramp, "as necessary and consistent with the purposes of [RSA] chapter [483-B] and other state law." The petitioners assert that DES violated RSA 483-B:9, IV-b because it: (1) failed to analyze whether the project or its size was "necessary"; (2) considered only two of the sixteen "purposes" listed in RSA 483-B:2; (3) failed to find that the project violates RSA 233-A:6 (2009) and RSA 162-C:6, :10 (2011); and (4) did not make specific findings regarding the project's "necessity" and compliance with the purposes of RSA chapter 483-B as well as other state law.

### 1. Necessity

The petitioners concede that RSA 483-B:9, IV-b allows DES to issue permits for "public water access facilities" that do not meet the minimum shoreland protection standards set forth in the other provisions of RSA 483-B:9. For the purposes of this appeal, we assume, without deciding, that they are correct. However, the petitioners contend that in order to comply with RSA 483-B:9, IV-b, DES had to evaluate whether the boat launch itself was "necessary" and whether it was "necessary" for F&G "to build a project that was so large that it did not comply with the minimum standards of the . . . Act" or "whether a small[er] [project] could comply with the intent of the Act." The petitioners assert that DES failed in this regard.

■ The petitioners' interpretation of the phrase "as necessary" ignores the fact that it applies to numerous facilities over which DES has neither jurisdiction nor expertise. The petitioners' interpretation leads to an absurd result when applied to such facilities. *See Appeal of Geekie*, 157 N.H. 195, 202 (2008) (court "will not interpret statutory language in a literal manner when such a reading would lead to an absurd result" (quotation omitted)).

■ Under the Act, DES "shall" issue permits for facilities for public water access, public water supply, sewage treatment, and hydroelectric power "as necessary . . . consistent with the purposes of [RSA] chapter [483-B] and other state law." RSA 483-B:9, III (public water supply), IV (sewage treatment), IV-a (hydroelectric), IV-b (public water access). The use of the word "shall" indicates a legislative mandate. *See In re Christopher K.*, 155 N.H. 219, 229 (2007) ("The general rule of statutory construction is that the word 'shall' is a command which requires mandatory enforcement." (quotation omitted)).

Because RSA 483-B:9, III, IV, IV-a, and IV-b all use the same phrase — "as necessary . . . consistent with the purposes of [RSA] chapter [483-B] and other state law" — we must interpret it to have the same meaning in all four provisions. *See Ocasio v. Fed. Express Corp.*, 162 N.H. 436, 451 (2011) ("Words used with plain meaning in one part of a statute are to be given the same meaning in other parts of the statute unless a contrary intention is clearly shown." (quotation omitted)).

The phrase "as necessary" cannot mean that DES must determine the necessity or design of facilities over which it lacks authority and expertise, such as hydroelectric plants, public roads, or public utility facilities. The legislature has specifically delegated such determinations to *other* state entities. *See, e.g.*, RSA ch. 162-H (Supp. 2012) (energy facilities); RSA ch. 230 (2009 & Supp. 2012) (certain state highways); RSA ch. 481 (2001 & Supp. 2012) (hydropower facilities). The phrase "as necessary" does not make DES a "super agency," which oversees the myriad state agencies that decide the need for, and design of, these public facilities. Given the complex array of statutes governing public roads and facilities for public water, sewage, hydroelectric power, public utilities, and public water access, we interpret the phrase "as necessary" to mean that a *permit* is necessary for the project — *i.e.*, that without it, the project cannot be completed.

### 2. Purposes of the Act

The petitioners assert that before DES may grant a permit under RSA 483-B:9, IV-b, it must evaluate the proposed public facility against all sixteen of the goals listed in RSA 483-B:2. We assume, without deciding, that the petitioners are correct. Relying upon the testimony of a DES staff person, the petitioners contend that DES violated RSA 483-B:9, IV-b because it considered only two of those goals. The testimony upon which the petitioners rely is as follows:

Q. Now, when you look at . . . the purposes of the chapter, where do you look for the[m] . . . ?

A. We actually look to [RSA] 483-B:2, minimum standards required.

Q. What does that say?

A. It lists 16 standards.

. . . .

Q. Can you summarize for the Council how this project even though it doesn't meet the actual minimum standards in one or two locations, is consistent with the purposes of the statute?

A. Because you're protecting the public use of water, including recreation. You're actually encouraging or enabling recreation. You are providing for economic development in proximity to a surface water by allowing people to utilize that water, making it more available to the general public of the state of New Hampshire. And you are — I mean, you're allowing for point of access while still conserving as much shoreline cover as you could on this particular project.

Q. Did you also consider things like erosion control and pollution production, things like that?

. . . .

A. There's an erosion control plan. There is the use of the pervious pavement. There's the reseeding and re-vegetation of all disturbed aspects of the site.

Q. In your opinion — is the plan consistent with the purposes of the Shorelands Act?

A. Yes.

The petitioners contend that this testimony demonstrates that DES considered only public access, *see* RSA 483-B:2, XIII, and economic development, *see* RSA 483-B:2, XVI, and did not consider the other fourteen goals listed in RSA 483-B:2. The Wetlands Council specifically rejected that interpretation of the testimony, and we conclude that it did not err by so doing.

The Wetlands Council found that DES "reviewed the proposal against both RSA 483-B:[1] Purpose and RSA 483-B:[2] Standards." The same staff person testified:

In the context of consistent with the intent and purpose of the Act, it becomes a case-by-case review and balancing of the items, the five items outlined in [RSA 483-B:1] and 16 items that [DES is] directed to develop standards for in [RSA 483-B:2]. So looking at the overall intent in those 16 . . . standards, where our standards shall serve a way to address these 16 issues, the question is where does the project[ ] fall in those 16, and do we believe a good faith effort has been made to do the most you can do to protect water quality while still allowing the development potential, protecting the resources — the historic resources, the economic development, the habitat, the access, preventing flooding and erosion, have you tried to get the best of all 16.

The text of DES's permit decision also demonstrates that DES properly considered the Act's requisite purposes. DES specifically found:

> The purpose and intent of RSA [chapter] 483-B is to fulfill the
> state's ro[le] as trustee of its waters and to promote public health,
> safety, and the general welfare by providing for economic devel-
> opment in proximity to the water, conserving shoreline cover and
> points of access to inland and coastal waters, and protecting public
> use of waters and recreation.
>
> [DES] finds that plans [submitted with F&G's application] pro-
> vide sufficient evidence to meet the aforementioned purpose and
> intent of RSA [chapter] 483-B.

Because there is evidence to support the Wetland Council's finding that
DES reviewed the proposal against the purposes listed in RSA 483-B:1 and
the goals listed in RSA 483-B:2, we uphold it.

### 3. Other State Law

The petitioners contend that to evaluate whether the project complies
with "other state law," DES had to analyze whether it violated RSA 233-A:6
and RSA 162-C:6 and :10. The Wetlands Council rejected this interpreta-
tion of RSA 483-B:9, IV-b, as do we.

#### a. RSA 233-A:6

RSA chapter 233-A governs the New Hampshire Statewide Public
Boat Access Program. *See* RSA 233-A:3 (2009). Under RSA 233-A:6, F&G
is required to "prepare plans and designs for public boat access areas and
related facilities" that "provide for adequate buffer areas." The petitioners
argue that F&G's plans violate RSA 233-A:6 because they do not contain
"adequate buffer areas." However, no language in RSA chapter 233 makes
DES responsible for administering or enforcing the statewide public boat
access program. We do not interpret RSA 483-B:9, IV-b as conferring that
authority on DES.

#### b. RSA 162-C:6, :10

RSA chapter 162-C governs the New Hampshire Council on Resources
and Development (CORD). RSA 162-C:6 pertains to the Land Conservation
Investment Program. RSA 162-C:6, III requires CORD to "manage the
lands acquired [through the Land Conservation Investment Program] so as
to preserve the natural beauty, landscape, rural character, natural re-
sources, and high quality of life in New Hampshire." RSA 162-C:10
provides that lands acquired through the Land Conservation Investment
Program "shall be held in public trust and used and applied for the
purposes of this subdivision."

██ The petitioners assert that the deed for the Wild Goose property specifically stated that the property was to be used "exclusively for conservation purposes," and that the proposed boat launch is inconsistent with this deed provision and with the Land Conservation Investment Program itself. However, RSA chapter 162-C does not make DES responsible for administering or enforcing the Land Conservation Investment Program, and RSA 483-B:9, IV-b does not confer that authority on DES. See N.H. Fish and Game Dep't, 165 N.H. 142 (the petitioners' separate action regarding approval of the project under RSA chapter 162-C).

### 4. Findings

██ The petitioners fault DES for failing to refer to RSA 483-B:9, IV-b in its decision and for failing to make specific findings that the project was "necessary" and "consistent with the purposes of [RSA] chapter [483-B] and other state law." The plain language of RSA 483-B:9, IV-b does not support these assertions. There is nothing in the plain language of RSA 483-B:9, IV-b that requires DES to make specific findings or to refer to specific statutes when it grants a permit application. The petitioners' reliance upon case law developed in the context of adjudicated matters is misplaced. See Appeal of City of Nashua, 138 N.H. 261, 263-64 (1994). Although the hearings before the Wetlands Council are adjudicative proceedings, DES's decision to grant a permit to F&G was not an adjudicative decision. See RSA 541-A:1, I, IV (2007); Appeal of Town of Bethlehem, 154 N.H. 314, 326 (2006).

### B. RSA 483-B:3, II

The Act requires a fifty-foot setback for "[p]rimary structures." RSA 483-B:9, II(b) (Supp. 2012). The local ordinance requires a seventy-five foot setback for "[p]ermanent, temporary or portable buildings and structures." The petitioners contend that the local seventy-five foot setback applies to the parking lot and access roads for the project. They assert that DES was required to enforce the local setback because it was more stringent than the fifty-foot setback and, under RSA 483-B:3, II, "the more stringent standard shall control." They contend that DES failed to enforce the local setback by approving F&G's plans.

The Wetlands Council rejected this argument on two grounds. First, it ruled that the statute — RSA 483-B:3, II — does not apply to the project. According to the Wetlands Council, "only RSA 483-B:1 Purpose need be satisfied as RSA 483-B:9 IV-b applies to this public boat ramp." Second, the Wetlands Council ruled that the local setback did not apply to the project because state developers generally are exempt from local zoning ordinance restrictions. See RSA 674:54 (2008); see also Region 10 Client Mgt., Inc. v.

*Town of Hampstead*, 120 N.H. 885, 888 (1980) ("[Z]oning restrictions do not apply to the State or its agencies unless the legislature has clearly manifested an intent that they shall." (quotation omitted)).

On appeal, the petitioners challenge only the second reason the Wetlands Council gave for rejecting their argument — *i.e.*, that the local setback does not apply because state developers are generally exempt from local zoning restrictions. They do not challenge the first reason the Wetlands Council gave — *i.e.*, that RSA 483-B:3, II does not apply to projects approved pursuant to RSA 483-B:9, IV-b. Because the petitioners have challenged only the second reason the Wetlands Council gave for its conclusion, they have not shown that the Wetlands Council's first reason was unlawful or unreasonable. Accordingly, we uphold its decision that RSA 483-B:3, II did not apply.

We have reviewed the petitioners' remaining arguments and conclude that they do not warrant extended consideration. *See Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Affirmed.*

CONBOY, LYNN and BASSETT, JJ., concurred.