NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Waste Management Council
No. 2012-750

APPEAL OF OLD DUTCH MUSTARD CO., INC.
(New Hampshire Waste Management Council)

Argued: October 10, 2013
Opinion Issued: July 16, 2014

Sheehan, Phinney, Bass + Green, P.A., of Manchester (John-Mark Turner and Robert P. Cheney, Jr. on the brief, and Mr. Turner orally), for the petitioner, Old Dutch Mustard Co., Inc.

Michael A. Delaney, attorney general (Mary E. Maloney, assistant attorney general, on the brief), for the New Hampshire Department of Environmental Services.

Gottesman and Hollis, P.A., of Nashua (Paul M. DeCarolis on the brief and orally), for the intervenor, Pioneer Point Enterprises, LLC.

BASSETT, J. The petitioner, Old Dutch Mustard Co., Inc., appeals from a decision of the New Hampshire Waste Management Council (Council) upholding a determination by the New Hampshire Department of Environmental Services (DES) to grant a permit to the intervenor, Pioneer Point

Enterprises, LLC (Pioneer), to build and operate a solid waste facility adjacent to the petitioner's property.  We affirm.

The following facts are taken from the record or are otherwise undisputed.  In May 2008, Pioneer applied for a permit to operate a solid waste management facility in an existing structure near the Souhegan River in Greenville.  The Souhegan River is a "designated river" under the New Hampshire Rivers Management and Protection Act (RMPA), see RSA ch. 483 (2013), and under the Comprehensive Shoreland Protection Act (CSPA), see RSA ch. 483-B (2013 & Supp. 2013).*  As a "designated river," the Souhegan River is subject to the protection measures set forth in the RMPA and CSPA.  See RSA ch. 483; RSA ch. 483-B.  In its application, Pioneer represented that it planned to utilize the entire building for solid waste operations.  DES denied the permit, concluding that the proposed facility violated the 250-foot setback requirement for solid waste facilities specified in the RMPA.

Approximately six months later, Pioneer submitted an amended application, accompanied by a request for a waiver to build a new access driveway within fifty feet of the petitioner's property.  Pioneer proposed to divide the building into three units, utilizing only the center unit, Unit 2, for solid waste activities, and preventing internal access between the units.  Under this proposal, only part of Unit 3 would encroach on the 250-foot river setback.  While its application was pending, Pioneer began work on the building, installing in Unit 2 new bathrooms, windows, insulation, flooring, a pellet stove, roofing and a water meter.  In Unit 1, it renovated the electrical and fire systems.  DES issued Pioneer a permit to operate the solid waste facility and granted the waiver.

The petitioner appealed the issuance of the permit and waiver to the Council pursuant to RSA 21-O:14, I-a (Supp. 2013) and RSA 21-O:9, V (2012).  Pioneer intervened and participated in the two-day hearing.  After the hearing, the Council ruled that the petitioner failed to prove that the issuance of the permit and waiver was either unreasonable or unlawful under the circumstances of this case.  The Council found that because only Unit 2 would be used for handling and disposing of solid waste, the solid waste facility comprised only Unit 2 and not the entire building.  It found that the waiver would improve safety.  The Council subsequently denied the petitioner's motion for rehearing.

The petitioner appeals, arguing that the Council erred when it:  (1) concluded that only Unit 2 constituted the facility, or, alternatively, that Unit 2 itself did not violate the 250-foot setback; (2) failed to rule that because of

---

* In 2011, the legislature amended the title of the CSPA to the Shoreland Water Quality Protection Act (SWQPA).  We use the CSPA because that was the title in effect at the time of the appeal.  Laws 2011, 224:382.

2

Pioneer's pre-permit construction, DES was required to deny the permit; (3) failed to consider the impact on the petitioner of granting the driveway setback waiver; and (4) reviewed the waiver of the driveway setback under an incorrect standard.

To prevail on appeal, the petitioner must show that the Council's order was "clearly unreasonable or unlawful." RSA 541:13 (2007); see RSA 21-O:14, III (2012) (providing that appeals of Council decisions are governed by RSA chapter 541). The Council's findings of fact "shall be deemed to be prima facie lawful and reasonable," and the decision "shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable." RSA 541:13.

I. Meaning of "Facility"

The petitioner first argues that the Council erred when it interpreted the term "facility" as used in RSA 149-M:4, IX (2005) to encompass only Unit 2. It contends that the entire building — not just Unit 2 — constitutes a "location, system, or physical structure for the collection, separation, storage, transfer, processing, treatment, or disposal of solid waste." RSA 149-M:4, IX. Alternatively, it contends that even if only Unit 2 constitutes the facility, the Council erred because the accessory structures for Unit 2 encroach on the 250-foot setback.

Resolving these issues requires statutory and regulatory interpretation. We review an agency's interpretation of a statute de novo. See N.H. Dep't of Envtl. Servs. v. Marino, 155 N.H. 709, 713 (2007). "We are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole." Appeal of Lake Sunapee Protective Ass'n, 165 N.H. 119, 125 (2013). However, "it is well established in our case law that an interpretation of a statute by the agency charged with its administration is entitled to deference." Appeal of Town of Seabrook, 163 N.H. 635, 644 (2012). Nonetheless, "[w]hile an agency's interpretation of its regulations is to be accorded deference, our deference is not total." Vector Mktg. Corp. v. N.H. Dep't of Revenue Admin., 156 N.H. 781, 783 (2008). We "examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve." Id. (quotation omitted).

We use the same principles of construction when interpreting both statutes and regulations. Id. We first look to the language of the statute or regulation itself, and, if possible, construe that language according to its plain and ordinary meaning. Id.; Marino, 155 N.H. at 713. When the language of the statute or regulation is clear on its face, its meaning is not subject to

modification. <u>Marino</u>, 155 N.H. at 713. We will neither consider what the legislature or commissioner might have said nor add words that they did not see fit to include. <u>Id</u>. Furthermore, we interpret statutes and regulations in the context of the overall statutory and regulatory scheme and not in isolation. <u>Id</u>. Our goal is to apply statutes and regulations in light of the legislature's or commissioner's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory and regulatory scheme. <u>Id</u>.

The RMPA provides that "[a]ny new solid waste storage or treatment facility, as defined in RSA 149-M:4, IX shall be set back a minimum of 250 feet from the normal high water mark of a designated natural river." RSA 483:9, VI (2013); <u>see also</u> RSA 483:9-a, VII, :9-aa, VII, :9-b, VII (2013). Furthermore, the CSPA states that "[n]o solid waste facility shall place solid waste within 250 feet of the reference line of public waters." RSA 483-B:9, IV-d (2013).

A. The Facility

The issue before us is whether the entire building — rather than only Unit 2 — constitutes a facility under the RMPA and the CSPA. RSA 149-M:4, IX defines "facility" as "a location, system or physical structure for the collection, separation, storage, transfer, processing, treatment, or disposal of solid waste." The Council found, "under the circumstances of this case, that [DES] reasonably and lawfully concluded that Unit #2 and its related features devoted to the handling and disposal of solid waste, but not the entire building, constitutes the solid waste 'facility' within the meaning of RSA 149-M:4, IX." The Council concluded that "[t]he fact that Unit #2 shares certain common physical features with the remainder of the building . . . is not sufficient to treat the entire structure as a solid waste facility."

DES and Pioneer argue that, under the statute's definition, Unit 2 is the facility. DES argues that the word "for" in the definition means "with the objective or purpose of." DES and Pioneer contend that Unit 2 is independent from the other units, and that Unit 3 is the only part of the building that is within the setback. Because Unit 2 is the single unit used <u>for the purpose of</u> solid waste collection and treatment, they argue that it was reasonable for the Council and DES to consider only Unit 2 as the facility.

The petitioner counters that "'for' does not imply an exclusive purpose," and that the Council is essentially reading the words "entirely devoted" or "only for" into the statute. It contends that the legislature uses the terms "exclusively for," "only for," or "solely for" when it intends an exclusive purpose. Hence, the petitioner argues that the entire building is a facility because one of the purposes or goals of the entire building is to conduct solid waste activities. Alternatively, it argues that the only activity now occurring in the building is solid waste processing. Therefore, "the overriding purpose of the Pioneer Point

4

building and site is solid waste management," and the entire building must be deemed a facility within the meaning of the statute.

We conclude that because both proffered interpretations of the statute are reasonable, the statute is ambiguous. See State v. Lathrop, 164 N.H. 468, 470 (2012). Under such circumstances, we turn to the legislative history to aid in our interpretation of the meaning of the statutory language. See Union Leader Corp. v. N.H. Retirement Sys., 162 N.H. 673, 677 (2011). Here, however, the legislative history of RSA 149-M:4 provides no guidance as to the intended meaning of the term "facility." Because there is no legislative history to shed light on this ambiguity, and given that the Council's determination of the meaning of "facility" is reasonable, we accord substantial deference to the Council's interpretation and its conclusion that, under these circumstances, the term "facility" applies only to Unit 2. See Grand China v. United Nat'l. Ins. Co., 156 N.H. 429, 434 (2007) (stating "we only accord substantial deference given a statute of doubtful meaning" (quotation omitted)).

The petitioner argues that the Council's interpretation "not only runs roughshod over the statutes but also DES' rules that make clear a facility is more than its waste handling and disposal areas." It contends that DES's regulations "list[] numerous facility features, only two of which are waste sorting and storage areas." We reject the petitioner's argument. The petitioner misinterprets the Council's interpretation. The Council did not narrowly limit its interpretation of the meaning of "facility" solely to those areas within a location, structure, or system that are used for waste handling and disposal. Rather, it applied the term to the entirety of Unit 2, including those areas inside Unit 2 that are not used for waste handling and disposal. Given that Unit 2 is discrete from the other units, it was not unreasonable for the Council to conclude that although all of Unit 2 constituted the facility, the entire building did not.

The RMPA is intended to "ensure the continued viability of New Hampshire rivers as valued ecologic, economic, public health and safety, and social assets . . . [and] to conserve and protect outstanding characteristics [of the rivers] including recreational, fisheries, wildlife, environmental, hydropower, cultural, historical, archaeological, scientific, ecological, [and] aesthetic." RSA 483:1 (2013). The purpose of the CSPA is to "maintain the integrity of public waters" and to "remove or minimize the effects of nutrients, sediment, organic matter, pesticides, and other pollutants." RSA 483-B:1, I, I-a (2013). Here, none of the solid waste activities that might pollute or harm the integrity of the public waters occurs within the setback. According to the permit application, the facility was "designed to be self contained and not to discharge any pollutants into the surface waters." Pioneer will transport any leachate off the property in sealed containers. Indeed, the petitioner does not contend that activities conducted at the solid waste facility would pollute

5

the Souhegan River. Given that the Council's interpretation of the term "facility" would not include solid waste activities occurring within the setback, its interpretation is consistent with the legislature's stated purpose in enacting the RMPA and the CSPA.

In sum, we conclude that the petitioner has failed to show that, under the circumstances of this case, the Council's construction of the term "facility" was clearly unreasonable or unlawful.

### B. Accessory Structures

The petitioner next argues that even if the facility consists only of Unit 2, the drainage pipes originating in Unit 2, as well as the eastern access road, encroach into the setback. According to the petitioner, because accessory structures are part of Unit 2, the facility violates the setback. DES and Pioneer respond that the petitioner is improperly treating the accessory structures as a part of Unit 2. We agree with DES and Pioneer.

There is no dispute that there are accessory structures within the setback. The entire building, including Unit 2, has drainage pipes that run through, and discharge water within, the 250-foot setback. Also, a drain from Unit 2 empties into a detention pond, which is drained by a twelve-inch culvert that crosses into the setback. Pioneer also proposes to construct a road within the setback on the eastern side of the property, which would provide access to the rear of the building and would allow fire trucks to reach the fire hydrant on the north side of the building.

The Council concluded that the proposed accessory structures did not violate the CSPA and the RMPA because "drainage systems such as these are contemplated by the setback exceptions" and allowed under RSA 483-B:9, IV-d. It also found that the petitioner "had failed to prove that the 250-foot setback would unavoidably be breached by operations of the trucks." We agree with the Council.

The CSPA states that "any solid waste facility may be allowed, subject to permitting conditions under RSA 149-M:9, to erect accessory structures and conduct other activities consistent with the operation of the facility within 250 feet of the reference line of public waters." RSA 483-B:9, IV-d. The CSPA defines "accessory structure" as "a structure . . . on the same lot and customarily incidental and subordinate to the primary structure . . . or a use, including but not limited to paths [or] driveways." RSA 483-B:4, II (2013). The plain language of the statute allows accessory structures such as drains or roads within the setback.

6

The petitioner argues that even if this language "constituted a setback exception[,] . . . the exception is to the CSPA's setback not to the separate setback established by the RMPA." It contends that the RMPA prohibits facilities within the setback, that no exceptions are permitted, and that, therefore, the RMPA's more stringent standards must apply. We disagree because the RMPA bans only a <u>facility</u> from being within the 250-foot setback. It does not ban accessory structures, which are distinct from the facility itself. RSA 483:9, VI. The RMPA states "[a]ny new solid waste storage or treatment <u>facility</u>, as defined in RSA 149-M:4, IX shall be set back a minimum of 250 feet." <u>Id</u>. (emphasis added).

"We construe statutes, where reasonably possible, so that they lead to reasonable results and do not contradict each other." <u>Grant v. Town of Barrington</u>, 156 N.H. 807, 812 (2008) (quotation, brackets, and ellipses omitted). Accordingly, because, as this case demonstrates, the CSPA and RMPA can regulate the same bodies of water, we construe them together so that one statute does not permit what the other statute prohibits. See <u>Williams v. Babcock</u>, 121 N.H. 185, 190 (1981) ("statutes in <u>pari</u> <u>materia</u> should be read as a part of a unified cohesive whole").

The CSPA provides that a "solid waste facility may be allowed . . . to erect accessory structures." RSA 483-B:9, IV-d. The fact that the CSPA allows solid waste facilities to construct accessory structures and defines accessory structures as "incidental" and "subordinate" to the "primary structure" denotes that accessory structures are distinct from the facility itself. Given that the RMPA contains no language mandating that a facility be regarded as including accessory structures, we decline to read the RMPA to employ a definition of "facility" that differs from and is inconsistent with that of the CSPA. Consequently, we conclude that the construction of accessory structures does not violate the RMPA requirement that a <u>facility</u> not be located within the 250-foot setback.

The petitioner contends that if "accessory structures" are not part of a facility, "there would be no encroachment on the setback and thus absolutely <u>no</u> reason for the legislature to grant an exception to the setback" in RSA 483-B:9, IV-d. However, this argument does not reflect the purpose of RSA 483-B:9, IV-d. The statute does not provide for an exception to the setback requirement for facilities, but rather clarifies which structures or uses, "consistent with the operation of the facility," are allowed within the 250-foot setback. RSA 483-B:9, IV-d. Indeed, the petitioner concedes this point in a footnote:

> [RSA 483-B:9, IV-d] appears to allow existing solid waste facilities to establish drainage and similar structures within the setback

7

without violating the prohibition established in the first half of
:9, IV-d, against placing solid waste within the setback.

Given that accessory structures are not included in the definition of a "facility," and their construction within the setback does not violate the RMPA or the CSPA, we conclude that the petitioner has failed to demonstrate that the Council acted unreasonably or unlawfully in allowing Pioneer to build the accessory structures within the setback.

## II. Pre-Permit Construction

Pioneer began construction before receiving the DES permit in October 2010. In Unit 2, Pioneer installed new bathrooms, windows, insulation, flooring, a pellet stove, roofing over the used motor oil acceptance area, and a water meter. Pioneer also renovated the electrical and fire systems in Unit 1, and paved a drop-off area.

The petitioner argues that the Council erred in upholding DES's issuance of the permit given Pioneer's pre-permit construction activity. It argues that Pioneer's "blatant violations" of RSA 149-M:9, I (2005) and the applicable regulation, required DES to deny the permit. DES responds that the provisions which the petitioner cites do not compel denial of a permit. Alternatively, DES and Pioneer contend that Pioneer did not engage in any pre-permit activities involving solid waste collection and management prohibited by those provisions.

The plain wording of the statutes and regulations leads us to reject the petitioner's argument. RSA 149-M:9, I states, in pertinent part, that "[n]o person shall construct, operate, or initiate closure of a public or private facility without first obtaining a permit from the department." Although RSA 149-M:9, I, prohibits pre-permit construction, it contains no language requiring DES to deny a permit when an applicant engages in pre-permit construction. Indeed, the grounds for denying a permit are outlined elsewhere. RSA 149-M:9, X (2005) states that "[t]he department shall not issue a permit for a solid waste facility unless the facility meets the terms and conditions required in rules adopted by the commissioner." (Emphasis added.) Moreover, under RSA 149-M:12, I(a) (2005), "[t]he department shall approve an application for a permit only if it determines that the facility or activity for which the permit is sought will: (a) Comply with this chapter and all rules adopted under it." (Emphasis added.) DES is compelled to deny a permit only if: (1) the proposed activity fails to comply with statutory and regulatory requirements; (2) the application is insufficient, ambiguous or dormant; (3) the applicant is a felon convicted within five years prior to the date of the permit application, or is of questionable reliability, expertise, integrity, and competence; (4) the applicant has no legal right to the subject property; or (5) the application meets any other

provision for denial as specified in the solid waste rules. N.H. Admin. Rules, Env-Sw 305.03(b).

The plain language of the above-cited provisions requires DES to deny a permit if the facility or activity conducted within the facility fails or will fail to comply with the statutory and regulatory requirements for operation of a solid waste facility. N.H. Admin. Rules, Env-Sw 305.03(b). The "activity" contemplated is that for which the permit is sought — namely, the operation and management of a solid waste facility. See RSA 149-M:12, I(a); RSA 483:B-7, IV-d. Construction is not an "activity" within the scope of the statute and regulations. Thus, there is no statutory or regulatory requirement that DES deny a permit if an applicant engages in construction prior to receiving the permit.

We observe that our interpretation does not mean that an entity can violate RSA 149-M:9, I with impunity. The commissioner is authorized to impose an administrative fine of up to $2,000 for each violation. See RSA 149-M:16 (2005). An entity may also be convicted of the misdemeanor of unlawful operation of a solid waste facility. See RSA 149-M:15, III (2005); State v. Guay, 164 N.H. 696, 698 (2013). We also note that the entity that begins construction activity is exposed to the risk of losing its investment if it ultimately fails to secure a permit.

Accordingly, we conclude that the petitioner has not shown that it was unreasonable or unlawful for the Council to issue the permit, notwithstanding the fact that Pioneer may have conducted pre-permit construction activity. For this reason, we need not address the alternative argument that Pioneer did not engage in activity prohibited under the relevant provisions.

III. Waiver

In order to construct a driveway entrance within fifty feet of the petitioner's property, Pioneer requested a waiver of the regulation that requires that a solid waste facility be "no less than 50 feet from any property line." N.H. Admin. Rules, Env-Sw 403.02(b). DES granted the waiver. The petitioner appealed to the Council, arguing that DES erred when it failed to consider whether the proposed driveway entrance would affect the petitioner's operations. In upholding the issuance of the waiver, the Council concluded that the petitioner failed to meet its burden of proof. In its order, the Council explained that:

> [w]itnesses for the State and [Pioneer] testified . . . that locating the new driveway entrance . . . within the 50-foot setback benefited Pioneer Point's intended use of the parcel, but furthermore, it actually created,

for a number of reasons . . . a safer access to the subject property and adjacent properties as well.

The Council further noted that the Town of Greenville had granted an approval of the proposed driveway.

On appeal, the petitioner argues that the Council erred in not deciding whether DES had failed to consider the impact on its business of a driveway setback waiver. Specifically, the petitioner contends that DES erred because it did not interview the petitioner, did not perform a traffic impact analysis, and "did not do any sort of analysis as to whether locating the driveway with a [waiver] would interfere with [the petitioner's] shipping." (Quotation omitted.) We disagree. Nothing in the applicable regulations or statutes require that DES interview the petitioner or perform a traffic impact analysis. Rather, DES may grant a waiver from a rule if it will "[n]ot result in an impact on abutting properties that is more significant than that which would result from complying with the rule." N.H. Admin. Rules, Env-Sw 202.04(a). Given that language, DES is required only to make a determination as to the relative overall impact of the waiver on the abutter, and it did so in this case.

Even if we were to assume that DES was required to consider the impact of traffic on the abutter, the record establishes that Pioneer provided sufficient information in both its permit application and at the hearing to allow DES and the Council to assess the effect on traffic of granting the waiver. In its permit and waiver application, Pioneer explained that "[t]he turning radius for the entrance allows for the safe ingress and egress of vehicles coming from both directions and will not obstruct the flow of the general traffic." Pioneer estimated that fifteen vehicles would visit the property in an hour and that "[a]ny queuing of traffic will occur on the facility site and, as a result, will not inhibit the traffic flow on neighboring public streets." Pioneer's engineer testified at the hearing before the Council that the Town of Greenville examined the traffic and specifically requested that the road be closer to the petitioner's property to make a "better intersection." Moreover, as a DES employee explained to the Council, using the existing driveway was "less safe" than granting a waiver for the new driveway, because the existing driveway was very steep.

Although the petitioner introduced an expert report stating that the proposed layout was inadequate to allow proper vehicle maneuvering and could cause problems with traffic circulation, DES and the Council were not "compelled to accept the opinion evidence of any one witness or group of witnesses." Appeal of Pennichuck Water Works, 160 N.H. 18, 26 (2010). "Whether it should rely upon the expert testimony . . . is a matter for its judgment based upon the evidence presented." Id. (quotation omitted). Therefore, DES and the Council were not compelled to accept the opinion of the

petitioner's expert, and they were entitled to rely upon the traffic information that Pioneer presented in its application and at the hearing.

IV. Standard of Review

Finally, the petitioner argues that, in regard to the driveway setback waiver, the Council applied an incorrect standard of review of DES's decision. The petitioner contends that the Council erred when, instead of reviewing the underlying decision for reasonableness and compliance with the law, it independently weighed the evidence to determine whether DES should have granted a waiver. It argues that the Council was obligated to "analyze whether DES' review of the [waiver] criteria" complied with the regulations governing such waivers. See N.H. Admin. Rules, Env-Sw 202.04(a)(1)(b). We disagree.

The petitioner misconstrues the standard of review. Under the Council's procedural rules, the petitioner had the burden to prove that the DES decision was: "(1) contrary to case law, statute, or rules; or (2) arbitrary and capricious." N.H. Admin. Rules, Env-WMC 205.14. Furthermore, the Council is allowed to admit new testimony, documents, materials and objects into evidence. See RSA 21-O:14, I-a ("the council shall determine whether the department decision was unlawful or unreasonable by reviewing the administrative record together with any evidence and testimony the parties to the appeal may present"); N.H. Admin. Rules, Env-WMC 205.07. Therefore it was not error for the Council to analyze the totality of the evidence — including the new evidence presented at the hearing — to determine whether the decision to grant a waiver was lawful and reasonable.

For the foregoing reasons, we conclude that the petitioner has not sustained its burden of showing by a clear preponderance of the evidence that the decision of the Council was unjust or unreasonable.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and LYNN, JJ., concurred.

11